407 Pa. Superior Ct. 565 (1991)
595 A.2d 1290
In re Application of the MILTON S. HERSHEY MEDICAL CENTER OF the PENNSYLVANIA STATE UNIVERSITY.
Appeal of John DOE, M.D.
In re Application of the HARRISBURG HOSPITAL.
Appeal of John DOE, M.D.
Superior Court of Pennsylvania.
Argued July 10, 1991.
Decided July 30, 1991.
*566 Bruce E. Cooper, Harrisburg, for appellant.
Richard M. Faulkner, State College, and Thomas B. Schmidt, III, Harrisburg, for appellee.
Scott Burris, Philadelphia, amicus curiae.
Before CAVANAUGH, WIEAND and POPOVICH, JJ.
POPOVICH, Judge:
This appeal involves a delicate issue of first impression in this Commonwealth. We are asked to decide whether the trial court correctly permitted two hospitals to disclose the identity of a member of their staffs who tested positive for the Human Immunodeficiency Virus (HIV). The physician, whose pseudonym John Doe has become familiar to this Court,[1] was an obstetrics/gynecology resident working alternately between the Milton S. Hershey Medical Center to the Pennsylvania State University ("Hershey Medical Center") and the Harrisburg Hospital. Dr. Doe, during an *567 invasive, internal procedure, sustained a cut through his surgical glove and exposed a patient to his infected blood. Reproduced Record ("R."), at 195a. Although the risk that the patient contracted the HIV infection was minimal, the possibility was there, and, thus, litigation ensued. The outcome was the trial court's order compelling disclosure of Dr. Doe's name and certain medical information to a limited populace. This appeal followed.
Because the specific facts of this case are so important to our discussion, we take this opportunity to detail its history more fully. Dr. Doe was a resident physician participating in a four year program involving obstetrics and gynecology. On May 19, 1991, during the course of an invasive operative procedure, Dr. Doe was accidentally cut by the attending physician. The record does not indicate whether there was an actual transfer of blood between Dr. Doe and the patient. It appears that there was not, although no one can be certain.[2]
The following day, Dr. Doe voluntarily submitted to blood testing for the HIV virus. On May 21, 1991, Dr. Doe was informed that the test results were positive. At that time, Dr. Doe voluntarily withdrew from participation in further surgical procedures. An additional test called the Western Blot was performed on Dr. Doe's blood. The results, which were returned on May 28, 1991, confirmed that Dr. Doe was HIV positive. Dr. Doe informed the appropriate officials of his condition and pursued a voluntary leave of absence.
*568 After investigation, Hershey Medical Center identified 279 patients who had been involved to some degree with Dr. Doe in the course of their medical treatment.[3] Likewise, *569 Harrisburg Hospital identified 168 patients who had been in contact with Dr. Doe since the time of his joint residency. As Dr. Doe points out, the nature and degree of his participation in the medical treatments were not presented to either the trial court or this Court. See Appellant's brief, at 5. Unfortunately, as has been explained to this Court during oral arguments, the hospital records do not necessarily reflect each time a physician is cut; nor do they particularize the distinct role played by each physician during a surgical procedure. See also R. at 42a; 56a; 97a-99a; 156a; 180a-181a; 184a; 206a. Thus, every patient who reasonably may have been exposed to Dr. Doe's condition was included in the statistics outlined above.
Both Hershey Medical Center and Harrisburg Hospital filed petitions alleging that there was a "compelling need" to disclose information regarding Dr. Doe's condition to the patients potentially affected by contact with him, as well as to certain staff members. The hospitals proceeded under The Confidentiality of HIV-Related Information Act ("The Act"), 35 P.S. §§ 7601-7612 (Purdon Supp.1991), particularly § 7608(a)(2). They argued, inter alia, that disclosure of Dr. Doe's identity was necessary to prevent the spread of *570 the AIDS disease. Most basically, the hospitals felt it their duty to inform the possibly affected individuals of their potential exposure to HIV and to offer them treatment, testing and counseling.
In addition, the hospitals believed that there was a compelling need to disclose Dr. Doe's name to the other treating physicians in the department, so that those physicians could contact their patients in the event that Dr. Doe assisted in any invasive procedures which involved them.[4] Finally, the hospitals felt that a limited disclosure was necessary to protect the other health professionals from stigmatism and to alleviate any "mass hysteria" that could result from a general disclosure. By providing the patients with adequate and sound information, at least those who were not involved with the obstetrics/gynecology division could be assured that they were not at risk to contract the HIV virus. In response, Dr. Doe asserted his right to privacy and argued that a compelling need did not exist tantamount to justifying the disclosure of his HIV-related information.
The petitions were filed in the Dauphin County Court of Common Pleas on June 10, 1991. An expedited in camera hearing was held before the Honorable Warren G. Morgan on June 10, 1991, and June 11, 1991. See 35 P.S. § 7608(f). The trial court issued an order allowing limited disclosure on June 14, 1991. The order was accompanied by an opinion. That day, Dr. Doe filed a notice of appeal to this Court.
The trial court granted a temporary stay of the June 14, 1991 order, which expired at 4:00 p.m. on June 17, 1991. This Court entered an order on June 17, 1991, extending the trial court's stay order until 4:00 p.m. on June 18, 1991. Dr. Doe's application for supersedeas filed with this Court was denied on June 18, 1991. On June 19, 1991, the hospitals began notifying their patients of Dr. Doe's status. Thereafter, *571 the parties filed briefs with this Court, and on July 10, 1991, we heard oral arguments. Our decision follows.
Although this Court certainly is cognizant of the many ramifications inherent in the disposition of this case, we nevertheless are confined to resolving one issue: whether the trial court abused its discretion in issuing its order. The questions that were raised during oral arguments were thoughtful and thought-provoking, and the concerns were, and still are, real. However, this Court may not issue advisory opinions. See Okkerse v. Howe, 521 Pa. 509, 520, 556 A.2d 827, 833 (1989) (advisory opinions are without legal effect); Courtney v. Ryan Homes, Inc., 345 Pa.Super. 109, 119, 497 A.2d 938, 942 (1985) ("courts are not instituted to render advisory opinions"); In re Condemnation by Commw. Dep't of Transp., 100 Pa.Commw. 546, 554, 515 A.2d 102, 106 (1986) ("advisory opinions are not within the purview of an appellate court's jurisdiction"). Thus, while we recognize the immense public interest in this case and its resolution, we are confined on appeal to an abuse of discretion standard. See John M. v. Paula T., 524 Pa. 306, 311-312, 571 A.2d 1380, 1383 (1990). After review, we must find that the trial court neither abused its discretion nor violated The Confidentiality of HIV-Related Information Act in advancing its determinations.[5]
The issue presented for our review is whether the hospitals sustained their burden of demonstrating a "compelling need" for the disclosure of Dr. Doe's HIV status in light of the strong proscriptions against disclosure under the Act. The trial court, after weighing the competing needs of public disclosure versus the doctor's privacy interest, found that the hospitals had met the test and ordered *572 that Dr. Doe's identity and his HIV-related information be revealed, selectively.
The trial court's order reads:
AND NOW, this 14th day of June, 1991, Petitioners are hereby authorized to disclose the identity of Dr. Doe, M.D. as follows and only as thus authorized:
1. By providing the name of Dr. Doe to the physicians in the Obstetrics and Gynecology Departments including the physicians in the residency program.
2. By providing the name of Dr. Doe to a physician authorized in writing by a patient for whom Dr. Doe participated in a surgical procedure or obstetrical care.
3. By describing Dr. Doe in letters to patients and in media releases as "a physician in our joint Obstetrics and Gynecology residency program" and by setting forth the relevant period of such service.
Each physician to whom the name of Dr. Doe is provided under 1. and 2. above shall be reminded that the Act prohibits further disclosure of such information.
Inasmuch as the trial court's order was effectuated, the issue before us on appeal is, technically, moot. Still, this case falls well within the exception to the rule that this Court may not entertain moot appeals. Commonwealth v. Smith, 336 Pa.Super. 636, 640-41, 486 A.2d 445, 448 (1984). The instant situation is one which is capable of repetition, yet it evades review. Id. However unfortunate, doubtless we will be confronted with this case scenario again. Thus, we will proceed to discuss the merits of Dr. Doe's appeal. See Petition of Daily Item, 310 Pa.Super. 222, 456 A.2d 580 (1983). See also Meyer v. Strouse, 422 Pa. 136, 221 A.2d 191 (1966) (discussing the "great public importance" exception to the mootness doctrine); Graziano Construction Co., Inc. v. Lee, 298 Pa.Super. 311, 444 A.2d 1190 (1982) (same).
The Confidentiality of HIV-Related Information Act, 35 P.S. §§ 7601-7612 (Purdon Supp.1991), was promulgated to promote voluntary blood testing to limit the spread of the Acquired Immune Deficiency Syndrome (AIDS). 35 P.S. *573 § 7602. In the interest of furthering public health, the Act assures that information gained as a result of the HIV testing will remain confidential. Id. See 35 P.S. § 7602(c) ("Intent.  It is the intent of the General Assembly to promote confidential testing on an informed and voluntary basis in order to encourage those most in need to obtain testing and appropriate counseling."). Admittedly, the Act strictly enforces the limited dissemination of an individual's confidential information. The disclosure of an individual's HIV-related status is subject to stringent regulation and few exceptions. 35 P.S. § 7607. Clearly, the Legislature took pains to account for a person's right to privacy. See generally, id. See 35 P.S. § 7607(b).
As with most rules, however, there are provisions for special circumstances. This case represents one of them.
Section 3 of the Act provides us with a definition of "confidential HIV-related information." That is,
Any information which is in the possession of a person who provides one or more health or social services or who obtains the information pursuant to a release of confidential HIV-related information and which concerns whether an individual has been the subject of an HIV-related test, or has HIV, HIV-related illness or AIDS; or any information which identifies or reasonably could identify an individual as having one or more of these conditions, including information pertaining to the individual's contacts.
35 P.S. § 7603. Section 7 of the Act dictates that those in possession of confidential information relating to an individual's HIV status must respect an obligation of confidentiality. Specifically, it provides, in pertinent part:
No person or employee, or agent of such person, who obtains confidential HIV-related information in the course of providing any health or social service or pursuant to a release of confidential HIV-related information under subsection (c) may disclose or be compelled to disclose the information, except to the following persons: [....] (10)[a] person allowed access to the information by a court order issued pursuant to section 8 [35 P.S. § 7608]. *574 35 P.S. § 7607(a) (remaining exceptions omitted as inapplicable). Dr. Doe did not consent to the disclosure of his identity or health status. Thus, the hospitals invoked the language of Section 8(a)(2) of the Act which reads:
(a) Order to Disclose.  No court may issue an order to allow access to confidential HIV-related information unless the court finds, upon application, that one of the following conditions exists: [....] (2) The person seeking to disclose the information has a compelling need to do so.
35 P.S. § 7608(a)(2). The general term "compelling need" may encompass any number of circumstances. The Act provides us with a standard for assessing "compelling need," but fails to define the phrase or set forth examples of what would constitute it. Under 35 P.S. § 7608(c), to determine the existence of "compelling need" the courts must engage in a balancing analysis. "In assessing compelling need for subsections (a) and (b), the court shall weigh the need for disclosure against the privacy interest of the individual and the public interests which may be harmed by disclosure." 35 P.S. § 7608(c).[6]
Given the infectious nature of the HIV virus, coupled with the fact that full blown AIDS is in all cases fatal, there is no question that Hershey Medical Center and Harrisburg Hospital were faced with a grave dilemma. Unquestionably, medical professionals have a duty to insure the health of their patients to the best of their capabilities. See THE HIPPOCRATIC OATH (providing, in part: "I will apply *575 dietetic measures for the benefit of the sick according to my ability and judgment; I will keep them from harm and injustice."). See Gostin, HIV-Infected Physicians and the Practice of Seriously Invasive Procedures, Hastings Center Rep.1989, 19(1): 32-39, at 34 (it is axiomatic that doctors should not knowingly place their patients at risk of contracting a deadly disease). See also Behringer v. The Medical Center at Princeton, 249 N.J.Super. 597, 614, 592 A.2d 1251, 1259 (1991), published in the AIDS Litigation Reporter 6282 (Andrews May 10, 1991). See American Medical Association Statement on HIV Infected Physicians (Jan. 17, 1991) (doctors who test HIV positive "have an ethical obligation not to engage in any professional activity which has an identifiable risk of transmission of the infection to the patient."). See also American Medical Association, Council on Ethical and Judicial Affairs, Ethical Issues Involved in the Growing AIDS Crisis, 259 J.Am.Med.A. 1360, 1361 (March 4, 1988). Surely, when individuals visit their doctors, they do not expect to confront a risk of illness different from that which they already suffer. A hospital, which invites the sick and infirm, impliedly assures its patients that they will receive safe and adequate medical care.[7]See also R. at 56a. Thus, there is instilled public confidence in the health care system. It is understandable that Hershey Medical Center and Harrisburg Hospital were concerned about their obligations to their patients. At the same time, the Act in question affords confidentiality to those carrying the HIV virus.
In this case, we have an added factor to consider. The physician who was infected by this potentially contagious and ultimately deadly virus, was involved in invasive surgical procedures where the risk of sustaining cuts and exposing patients to tainted blood was high. According to researchers, *576 while the chances of transmitting the HIV virus via surgical procedures is very slim  one commentator has estimated the chances to be 1/48,000  the potential is nevertheless there.[8] When one begins to calculate how many individuals may be subjected to the same risk[9] by the same medical worker, multiplied by the aggregate of infected health care professionals, the numbers become staggering. See Gostin, HIV-Infected Physicians and the Practice of Seriously Invasive Procedures, Hastings Center Rep.1989, 19(1): 32-39, at 33. Surely, it is no consolation to the one or two individuals who become infected after innocently consenting to medical care by an unhealthy doctor that they were part of a rare statistic. See Behringer, supra., 249 N.J.Super. at 651-652, 657-658, 592 A.2d at 1279, 1283. See Newsweek, July 1, 1991 (discussing the case of a young woman who contracted AIDS from her dentist). See Update: Transmission of HIV Infection During an Invasive Dental Procedure  Florida, 40 MMWR 2, at 21-33 (January 18, 1991) (same). See The New York Times, July 16, 1991, at B2 (headline reads, "Patients of AIDS Dentist Seek Tests").[10]
*577 Here, given the nature of Dr. Doe's residency and his involvement with the surgical teams at two hospitals, it is beyond dispute that the appellees demonstrated a compelling need for disclosure.
Dr. Doe strenuously argues that to allow future disclosures will be counter-productive and will discourage health professionals from seeking voluntary HIV testing. He contends that the facts here did not warrant the trial court's remedy and that if disclosure is permitted under the instant facts, the harm to the public interest in future like circumstances will be severe. Summarizing, Dr. Doe states:
The public will be given a message that having an HIV-infected physician, per se, creates a risk of AIDS. Hospitals in the future will risk liability if they fail to follow through with similar unsubstantiated notifications to patients. The already high cost of medical care will be increased because of needless repetitious HIV testing. The high cost of medical malpractice insurance will be increased by imposing a notification standard which goes beyond a [sound] public health policy, and physicians and other health care workers will be discouraged from treating those infected with HIV.
Appellant's brief, at 10. See also id. at 18-19. We have considered all of Dr. Doe's concerns. Certainly, it is unfortunate that Dr. Doe will be made to suffer personally and/or professionally as a result of his illness and this case. See generally, Behringer, supra. At the same time, however, we must consider societal implications.[11]See 35 P.S. *578 § 7602(a). In interpreting the Act, we must discern the intent of the Legislature in promulgating it, and its underlying policies. Section 2 of the Act provides, in pertinent part:
(c) Intent.  It is the intent of the General Assembly to promote confidential testing on an informed and voluntary basis in order to encourage those most in need to obtain testing and appropriate counseling.
[Cf.] (d) Further intent.  It is the further intent of the General Assembly to provide a narrow exposure notification and information mechanism for individual health care providers or first responders, who experience a significant exposure to a patient's blood and/or body fluids, to learn of a patient's HIV infection status and thereby obtain the means to make informed decisions with respect to modes and duration of therapy as well as measures to reduce the likelihood of transmitting an infection to others.
35 P.S. § 7602.[12] After weighing the competing interests in *579 this case,[13] we find that the scales tip in favor of the public health, regardless of the small potential for transmittal of the fatal virus. See Gostin, The HIV-Infected Health Care Professional: Public Policy, Discrimination, and Patient Safety, 18 Law, Medicine & Health Care 303, 306, 308 (1990) (suggesting that HIV positive physicians avoid "seriously invasive" procedures).
A close dissection of the trial court's order reveals that the information disclosed was minimal. Despite the practical consequences of this sort of dissemination, legally, the trial court's order was conservative and sound. See 35 P.S. § 7608(h). Even the patients who were treated by Dr. Doe were not informed of his identity. Only those medical professionals who had cause or reason to know of Dr. Doe's condition in order to help others were told of his HIV status. Even then, the trial court included a mandate precluding those individuals from disclosing his identity further.
Dr. Doe presented a health risk to his patients and to the patients of others. It is admirable that he chose to withdraw from his residency program voluntarily.[14] Indeed, he *580 must have recognized the jeopardy involved, however slight.[15] This Court does not deny Dr. Doe's right to privacy. Without question, one's health problems are a private matter to be dealt with by the individual in the way that s/he feels most comfortable and sees fit. Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876-877, 51 L.Ed.2d 64 (1977). See In re June 1979 Allegheny County Investigating Grand Jury, 490 Pa. 143, 150-51, 415 A.2d 73, 77 (1980) (discussing right to privacy in an individual's medical records). See also U.S. v. Westinghouse Electric Corp., 638 F.2d 570, 577 (3d Cir.1980). However, Dr. Doe's medical problem was not merely his. It became a public concern the moment he picked up a surgical instrument and became a part of a team involved in invasive procedures. R. at 96a-98a.[16]See U.S. v. Westinghouse Electric *581 Corp., 638 F.2d at 578 ("public health or other public concerns may support access to facts an individual might otherwise choose to withhold").
One of the inquiries in this appeal concerns the patient's right to make an informed decision regarding treatment. Should a patient be told of his/her physician's health status before consenting to medical care by that professional? In order to make an informed choice, should not the patient have before him/her all of the pertinent available information regarding the doctor's qualifications, including the fact that s/he might be carrying a transmittable, deadly virus? See Sagala v. Tavares, 367 Pa.Super. 573, 533 A.2d 165 (1987) (discussing informed consent). See also Clemons v. Tranovich, 403 Pa.Super. 427, 589 A.2d 260 (1991) (same); Festa v. Greenberg, 354 Pa.Super. 346, 511 A.2d 1371 (1986) (same). See Moure v. Raeuchele, 387 Pa.Super. 127, 563 A.2d 1217 (1989) (same); appeal granted by Moure v. Raeuchele, 524 Pa. 629, 574 A.2d 70 (1990) and appeal granted by Appeal of Raeuchele, 524 Pa. 629, 574 A.2d 71 (1990). Cf. Gostin, The HIV-Infected Health Care Professional: Public Policy, Discrimination, and Patient Safety, 18 Law, Medicine & Health Care 303 (1990).[17]
*582 Although these questions are legitimate and flow logically given the history of this case, these issues were raised by the non-moving party and their resolution is not pertinent to the disposition of this appeal. Also, to answer these questions would be to engage in speculation and would implicate constitutional considerations that we are not prepared to address.[18]But see Trial court opinion, at 6; R. at 71a.[19] *583 See also Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure-Prone Invasive Procedures, 40 MMWR RR-8, (July 12, 1991), at 4, 5, 6. See id. at 6 (heath care workers who are HIV positive "should not perform exposure-prone procedures unless they have sought counsel from an expert review panel and been advised under what circumstances, if any, they may continue to perform these procedures. [footnote omitted] Such circumstances would include notifying prospective patients of the [health care worker's] seropositivity before they undergo exposureprone invasive procedures."). See also Human Immunodeficiency Virus Infection: Physicians' Responsibilities, ACOG Committee Opinion 1, No. 85, Sept. 1990, at 3 (The American College of Obstetricians and Gynecologist's Committee on Ethics, discussing HIV positive obstetricians/gynecologists, suggests that the doctor should "inform patients about his or her seropositivity before procedures involving material risk of transmission.... Physicians who do not wish to reveal HIV status to patients have an obligation to avoid procedures involving risk of infection to the patient."). See Behringer, supra., 249 N.J.Super. at 654, 592 A.2d at 1281 ("[t]he difficulties created by the public reaction to AIDS cannot deprive the patient of making the ultimate decision where the ultimate risk is so significant."). See id., at 656, 592 A.2d at 1282 (discussing medical ethics).
We are not persuaded that the public was in any way harmed by disclosure. Conversely, the hospitals assert that they received over 3000 phone calls by alarmed individuals who wanted more information. While this may indicate hysteria, and perhaps the reaction was unjustified, it also shows the public's awareness of the seriousness of AIDS as well as the need to gather information concerning possible infection. See Leckelt v. Board of Commissioners, 909 F.2d 820 (5th Cir.1990). See also Pennsylvania Department of Health, Recommendations to the CDC on the Proposed *584 Guidelines to Reduce the Risk of Transmission of Blood-borne Pathogens to Patients during Invasive Procedures, March 29, 1991. Certainly, non-disclosure may have resulted in a failure by the potentially affected individuals to seek treatment. With no reason to think that s/he should be tested, a patient who feasibly may have been infected would remain unaware and perhaps inadvertently pass the virus to another unsuspecting individual. Cf. DiMarco v. Lynch Homes  Chester County, Inc., 525 Pa. 558, 583 A.2d 422 (1990).
Dr. Doe argues in addition that voluntary testing will be curtailed as a result of the instant disclosure.[20] We would hope that this is not the case. In this regard, we have looked to the legislative enactment and reach the same conclusion as did the trial court. In recognizing the importance of preserving confidentiality so as to promote voluntary testing, the trial court nevertheless stressed that the Legislature's intent in passing the Act was to prevent the spread of AIDS. The protection of confidentiality, while surely a motivating factor in encouraging voluntary testing, is only one of the means chosen to effect the fundamental goal. 35 P.S. § 7602. See Trial court opinion, at 9. Following this rationale to its logical conclusion, while at the same time reading the Act as whole, it is clear that "[t]he Legislature, in its wisdom, also understood that there may be circumstances of `compelling need' to prevent the spread of the disease which require some degree of sacrifice of confidentiality. This case presents such a circumstance." Brief of Hershey Medical Center, at 30.[21]
*585 Here, we wish to acknowledge Dr. Doe's reliance on Taylor v. West Penn Hospital, 48 Pa. D & C 3d 178 (1987). In the Taylor case, the Court of Common Pleas of Allegheny County set forth important policy considerations regarding the dissemination of AIDS related information. The court noted that
issues concerning the confidentiality of test results for blood donors testing positively for the AIDS virus intertwine with the larger policy of the confidentiality of AIDS testing in general. Presently, it is the position of most of those persons in the fields of public health, medical research, and treatment of AIDS that disclosure of test results (except in limited circumstances) would be counter-productive. At this time, most public health officials believe that the best strategy for limiting the spread of AIDS is to encourage the segments of the population most likely to be infected voluntarily to come forward for testing and through education and counseling to persuade those who are found to be AIDS carriers to refrain from engaging in activities that will infect others. The guarantee of confidentiality is the cornerstone of this strategy because persons will not voluntarily come forth if positive test results may be disclosed to third persons. Any court rulings that compel disclosure under rules of court governing discovery would significantly undermine this strategy. Even if a court opinion were narrowly drafted, it would be viewed by the general public as eroding the guarantee of confidentiality. The issue of under what circumstances the identities of those testing positively for AIDS should be disclosed should be left to those who establish public policy on matters affecting the health of this nation. Such decision will then (hopefully) be consistent with an overall strategy. Consequently, the impact of any court ruling compelling disclosure on public health policies governing AIDS is also a factor (although not *586 controlling) in determining the merits of plaintiffs' request.
Id. at 190-91. We are not, by this Opinion, eroding the guarantee of confidentiality. Rather, the legislature specifically included a provision in the Act to allow disclosure where there is a compelling need. 35 P.S. § 7608(c).
Additionally, Dr. Doe's name was not revealed to the public. The information disseminated to the patients was limited. In letters issued by the hospitals, the patients were informed that a resident physician who participated in their surgical procedure or obstetrical care is HIV-positive. They were then offered the opportunity to visit the hospitals for counseling and HIV testing. All efforts were made to keep Dr. Doe's identity confidential. See Snyder v. Mekhjian, 244 N.J.Super. 281, 296-97, 582 A.2d 307, 315 (1990) ("court shall determine procedures best calculated to provide plaintiff with the information he requires while giving maximum protection to the donor.").
AIDS is not a disease that is, or that should be taken lightly by our society. Rather, many view it as a problem of epidemic proportion that knows no bounds and discriminates against no one. Although HIV has been extensively researched, the public, justifiably or not, is wary and frightened of its prevalence in our society.[22] Acknowledging the public's perception, yet having become educated as to the facts and realities of HIV and AIDS, this Court has put public opinion aside and has attempted to balance the competing interests in this case carefully and thoroughly.[23] We *587 conclude, given the nature of Dr. Doe's profession, the demands of his work, the facts of this case, the need for disclosure, the harm that could result from disclosure and importantly, Dr. Doe's privacy interest, that the trial court acted properly in entering its order of June 14, 1991. We are fully cognizant of the importance of the Act and we realize the significance of our holding. In interpreting the legislative mandates and the scheme as a whole, we have been careful to try to effectuate its intent. We feel that this is a case in which Section 8(a)(2) was properly invoked and applied. Certainly, we do not wish to "punish" Dr. Doe or to encourage litigation.[24] Privacy rights are of paramount importance in this Commonwealth. But the public's right to be informed in this sort of potential health catastrophe is compelling and far outweighs a practicing surgeon's right to keep information regarding his disease confidential. We find no abuse of discretion. Accordingly, the trial court's order is affirmed.
Order affirmed.
NOTES
[1] See 35 P.S. § 7608(d). Note: This Court is not aware whether Dr. Doe is male or female. For the sake of simplicity, however, we will use the masculine pronoun where necessary.
[2] We adopt the trial court's finding that, even though the risk was not considerable, there was a chance that when the needle or scalpel pierced Dr. Doe's glove, it allowed an exchange of his blood into the patient's tissue. Trial court opinion, at 2, para. 4. See also Gostin, The HIV-Infected Health Care Professional: Public Policy, Discrimination, and Patient Safety, 18 Law, Medicine & Health Care 303 (1990), at 305-306 (discussing the probability of a doctor sustaining a skin cut during an operation); 307 (discussing "risk"). See Hagen, Meyer and Pauker, Routine Preoperative Screening for HIV: Does the Risk to the Surgeon Outweigh the Risk to the Patient?, 259 J.Am.Med.A. 1357, 1358 (1988) (discussing the statistics relative to glove punctures). See R. at 90a-91a.
[3] The trial court tentatively found that 364 patients may have been exposed to the HIV virus following medical care involving Dr. Doe. Trial court opinion, at 2, para. 5. Hershey Medical Center concedes in its brief that the true number was 279. In clarifying the discrepancy, Hershey Medical Center stated, "The source of the error is that Dr. Hamory, when counting the names on the list he had compiled, inadvertently included the names of referring physicians of those patients." Brief of Hershey Medical Center, at 5.

We note that the list of patients was compiled in a manner that was least intrusive to Dr. Doe's rights. The class of patients to be notified was narrowly drawn to include only those individuals whose contact with Dr. Doe involved intrusive procedures. R. at 88a-89a; 97a-98a; 138a-139a; 144a; 162a-163a. By strict tailoring of the class, only those who risked the possibility of infection were set apart, and Dr. Doe's interests were protected as best as possible. See Snyder v. Mekhjian, 244 N.J.Super. 281, 582 A.2d 307 (1990). We find that this limiting of the patient-pool to exclude those individuals who were absolutely not placed at risk by contact with Dr. Doe is crucial to our evaluation of this case. Although Dr. Doe disagrees, asserting that "[t]he disclosure permitted by the [trial] court was not to patients proven exposed to HIV, but to patients who might have been exposed to a risk of being exposed ...," the obstacle in this case is that actual proof is hard to come by.
All that we know is: (a) Dr. Doe is a physician; (b) Dr. Doe was involved in invasive, surgical procedures; (c) the risk of bleeding during surgery is high  "[s]tudies indicate that a surgeon will cut a glove in approximately one out of every four cases, and probably sustain a significant skin cut in one out of every forty cases." Gostin, HIV Infected Physicians and the Practice of Seriously Invasive Procedures, Hastings Center Rep.1989, 19(1): 32-39, at 33; see also Gostin, The HIV-Infected Health Care Professional: Public Policy, Discrimination and Patient Safety, 18 Law, Medicine & Health Care 303 (1990); (d) Dr. Doe tested HIV positive; (e) it is unknown the number of cases in which Dr. Doe exposed patients to his infected blood.
Given these facts, we cannot in good conscience agree with Dr. Doe that the trial court has allowed the hospital to include in its list of potentially infected patients all "remote possibilities" or "any conceivable risks." See Appellant's brief, at 24. Cf. Brief in Support of the Milton S. Hershey Medical Center's Petition for Disclosure of HIV-Related Information, at 5 ("There are approximately 400 patients who had contact with Dr. Doe in surgical procedures or baby deliveries, and several thousand who potentially had contact with Dr. Doe in other settings, such as physical examinations. It is clear that the Medical Center has a duty to notify those patients who were, by the best available medical knowledge, placed at some degree of risk because of the nature of their contact with Dr. Doe."). As the trial court commented:
The initial list compiled by Petitioners are those patients whose obstetrical or surgical care would have been rendered by Dr. Doe or by Dr. Doe in assisting other physicians in instances where Dr. Doe would have had either a scalpel blade or a suture needle in his hands or might reasonably have been expected to have either of those instruments in his hands. The risk status of the patient obviously is in proportion to Dr. Doe's involvement in the particular procedure. The operating room medical group includes the attending physician, two residents and possibly a medical student. Whether a particular individual in the group performed a particular procedure is not likely to appear on the operative notes. It follows that the only way it can be determined whether Dr. Doe simply observed, had contact with the patient other than in an invasive procedure; or was significantly involved in an invasive procedure in which he employed a blade or needle is by discussion with the other members of the surgical team.
Trial court opinion, at 5. See generally, Mishu, B., et al., A Surgeon With AIDS: Lack of Evidence of Transmission to Patients, 264 J.Am. Med.A. 467 (1990), at 470 ("Precise quantification of risks of HIV transmission from infected surgeons to patients may not be possible because of the inability to perform prospective studies.").
[4] It appears that these physicians would also work in another capacity: to advise patients of their options as well as educate them about the AIDS disease. Patients were encouraged to seek assistance from the hospital personnel in order to make an informed decision as to whether to be tested for the virus.
[5] In fact, this Court wishes to compliment the trial court for its sensitive treatment of Dr. Doe's case, as well as its comprehensive opinion. We also wish to acknowledge the attorneys for their fine arguments and work on the briefs, especially in light of the expedited nature of this matter.
[6] See generally, Pennsylvania Bar Association and Pennsylvania Medical Society, AIDS, A Medical-Legal Handbook, May 11, 1991. This particular AIDS handbook was published through the cooperation of the legal and medical communities. See id. at 26:

Compelling need. In determining whether or not there is a compelling need for testing, the court must measure the need for disclosure against not only the privacy interest of the individual, but also the general public interests that will be harmed by breach of privacy or involuntary testing. In accord with general law on testing, and the specific intention of the legislature to encourage voluntary testing, a "compelling need" should be understood to be a concrete medical need. A mere desire to know should not be enough. Instead, the person seeking the test must require the result in order to make an important medical decision.
[7] Naturally, there are no guarantees that the patient will be made well. However, generally, the patient does not worry that s/he will contract a new disease while seeking treatment for a current condition. Hospitals are state-licensed entities. Patients expect that the facilities will be conducive to improving health. The public presumes, furthermore, that hospital personnel will act responsibly in the face of a medical predicament.
[8] See Newsweek, July 1, 1991, at 50-51. See Recommendations for Prevention of HIV Transmission in Health Care Settings, 36 MMWR 2S (August 21, 1987). See Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure-Prone Invasive Procedures, 40 MMWR RR-8 (July 12, 1991) (new recommendations imply that hospitals have a right and maybe a duty to restrict the surgical activities of HIV-positive doctors). See Behringer, supra., 249 N.J.Super. at 625, 592 A.2d at 1264 (in the Behringer case, one expert testified that the risks of blood transfer shift depending upon the nature of the surgical procedure, "e.g., orthopedic surgeons or gynecological surgeons operating in some areas by "feel" bear a higher risk of accident than do surgeons such as ENT specialists."). Id.
[9] See Behringer, supra., 249 N.J.Super. at 654-656, 592 A.2d at 1281-1282 (discussing the concept of "risk").
[10] The American Civil Liberties Union of Pennsylvania filed a thorough and comprehensive brief, amicus curiae. The ACLU advances the argument that "life cannot be made risk free." Amicus Curiae brief, at 3. This is true. In our view, however, risks can be lessened through education and the dissemination of information necessary to contribute to informed and consensual choices.
[11] We feel compelled to comment on the amicus curiae position that "silence" is the crux of the Confidentiality of HIV-Related Information Act. Brief of Amicus Curiae, at 33. The ACLU asserts that "the court gave weight to the Appellees' interests in public relations: avoiding lawsuits that might arise from perception of secretiveness (i.e., a policy of confidentiality) and avoiding harm to the "reputations" of their staffs generally. These interests are simply not cognizable, and, indeed, are directly at odds with the policy of the Act." Id. Contrary to the ACLU argument, we find that one of the concerns of the Act is confidentiality. That is different from what we perceive to be the ACLU definition of secrecy. "Secrecy," in its purest form, exacerbates fear and aggravates misconceptions. The Act allows for confidentiality in testing, but includes limited exceptions when a compelling need for the release of certain information is demonstrated.

Moreover, case law acknowledges that individual privacy interests in medical information and records are not absolute. See Doe v. Borough of Barrington, 729 F.Supp. 376 (D.N.J.1990). At times, the societal interest in disclosure outweighs the individual's interest in privacy. To avoid a constitutional violation, the State must show a compelling interest for breaching the privacy right. Id. Here, the risk of transmission of a fatal disease, and the prevention of the spread of AIDS are both appropriate State interests.
[12] As a corollary, we note that the Act defines "significant exposure" as

[d]irect contact with blood or body fluids of a patient in a manner which, according to the most current guidelines of the Centers for Disease Control, is capable of transmitting human immunodeficiency virus, including, but not limited to, a percutaneous injury (e.g., a needle stick or cut with a sharp object), contact of mucous membranes or contact of skin (especially when the exposed skin is chapped, abraded or afflicted with dermatitis) or if the contact is prolonged or involves an extensive area.
35 P.S. § 7603. See also Trial court opinion, at 10-11.
[13] See United States v. Westinghouse Electric Corp., 638 F.2d 570, 578 (3d Cir.1980) (sets forth the factors to be considered when balancing competing interests). See Stenger v. Lehigh Valley Hospital Center, 386 Pa.Super. 574, 581-82, 563 A.2d 531, 534 (1989) (same); appeal granted by Petition of H.C.S.C. Blood Center, 525 Pa. 618, 577 A.2d 890 (1990) and appeal granted by Petition of Lehigh Valley Hospital Center, 525 Pa. 619, 577 A.2d 890 (1990) and appeal granted by Stenger v. Lehigh Valley Hospital Center, 525 Pa. 620, 577 A.2d 891 (1990).
[14] There is no indication in the record that Dr. Doe will choose to relinquish his medical career altogether. Nor is there evidence that Dr. Doe will refrain from pursuing work in the surgical field in the future. We recognize that these are valid public concerns, but they are not ones which are before us for resolution today. Nevertheless, we note the new Federal guidelines, recommended by the Centers for Disease Control on July 15, 1991, which emphasize strict adherence to infection control measures and strongly suggest that health-care workers who perform certain surgical procedures be tested for HIV and other infectious diseases. The guidelines recommend that infected individuals not participate in invasive procedures absent permission from an expert panel and notification to the patient. Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure-Prone Invasive Procedures, 40 MMWR RR-8 (July 12, 1991), at 5. See also Behringer, supra., 249 N.J.Super. at 656-657, 592 A.2d at 1282-1283.
[15] See American Medical Association Statement on HIV infected physicians (Jan. 17, 1991):

The health of patients must always be the paramount concern of physicians. Consequently, until the uncertainty about transmission is resolved, the American Medical Association believes that HIV infected physicians should either abstain from performing invasive procedures which pose an identifiable risk of transmission or disclose their sero-positive status prior to performing a procedure and proceed only if there is informed consent. As a corollary, physicians who are at risk of acquiring HIV infection, and who perform invasive procedures, should determine their HIV status.
Id. See also Leckelt v. Board of Commissioners, 909 F.2d 820 (5th Cir.1990) (discussing School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) and "significant risk").
[16] Public apprehension and fear about AIDS is pervasive and widespread. As the trial court aptly notes, "[s]carcely an issue of the daily paper fails to contain some story about the disease." Trial court opinion, at 6. Indeed, during the short pendency of this appeal, new guidelines were released, new information was publicized, and new headlines were printed, all related to AIDS. Every day, researchers evaluate proposed treatments and look for cures. See Doe v. Borough of Barrington, 729 F.Supp. 376, 381 (D.N.J.1990) (we "must take medical science as [we find] it; [our] decision may not be based on speculation of what the state of medical science may be in the future."). Clearly, when Dr. Doe operated on a patient, the question of whether to release information regarding his HIV status exceeded a pure privacy inquiry. See The Philadelphia Inquirer, July 15, 1991, at 1. See The Philadelphia Inquirer, July 16, 1991, at 1. See The New York Times, July 16, 1991, at 1. See The Philadelphia Daily News, July 18, 1991 (in an article titled, "Risk is Minimal," the newspaper reported that "The Center for Disease Control estimates that, over 10 years, three to 28 people may have been infected with AIDS by HIV-positive surgeons  out of an estimated 1 million operations performed by surgeons who have the virus."). See The Philadelphia Inquirer, July 19, 1991, at 3-A (headline, possibly indicating a future trend, reads, "Senate: Jail if doctors hide HIV infection"). Cf. Brief of Amicus Curiae, at 5 ("Public decisions of this kind should be left to the reasonable judgments of the legislature and public health officials....").
[17] The Gostin article suggests that

[t]he doctrine of informed consent was developed to assist patients in making decisions about the benefits and risks of medical treatments, and not to protect them against incompetent or dangerous physicians. If a physician is impaired or there is a real risk of transmission of infection to her patient, then this is a problem that should be remedied by professional standards and licensing requirements. Patients must be protected against unreasonable risks posed by practitioners; obtaining the patient's consent does not obviate the need for professional and licensing standards necessary to protect the patient.
Id. at 304. Cf. Gostin, The HIV-Infected Physicians and the Practice of Seriously Invasive Procedures, Hastings Center Rep. 1989, 19(1): 32-39, at 33-34. Cf. Behringer, supra., 249 N.J.Super. at 649-650, 592 A.2d at 1278.
[18] As we note in the body of this Opinion, the questions surrounding the issues of testing (who should be tested; how often; under what circumstances and/or conditions?) and informed consent (should the patient be informed of the doctor's health status before the medical procedure as part of the informed consent law; should the patient be informed of the doctor's health status after potential exposure or risk of exposure so that the individual may make an intelligent decision as to whether s/he wants to undergo testing for the viral infection; should the patient be informed of the doctor's health status at all; what questions should the patient ask?) are seemingly endless and possibly insurmountable. Unfortunately, answers are not readily available; nor are they within our domain. The task of resolving these most pressing inquiries rests with our Legislature and the appropriate medical committees, associations and boards. See American Medical Association, Council on Ethical and Judicial Affairs, Ethical Issues Involved in the Growing AIDS crisis, 259 J.Am.Med.A. 1360, 1361 (March 4, 1988). See also Newsweek, July 1, 1991, at 54 (discussing "universal precautions"). See Human Immunodeficiency Virus Infection: Physicians' Responsibilities, ACOG Committee Opinion 1, No. 85, Sept. 1990.
[19] Judge Morgan wrote

The medical authorities agree that the risk of infection was not considerable even if Dr. Doe had been involved in an invasive procedure but this is not enough. The human response to the possibility of a foreboding consequence is to ask "how great is the risk?" "What are the odds?" And the answer determines both the anxiety quotient and the measures one must or is willing to take to meet the risk. It will be suggested to these patients that they be tested for HIV and, in our opinion, there is no way they can give an informed consent within the governing principles announced by our appellate courts without as specific a description of the risk they confront as is reasonably possible. That description cannot be such if the particular role of Dr. Doe in that patient's surgical procedure is not known, and that cannot be known without identifying him to the other members of the surgical team.
Trial court opinion, at 6; R. at 71a.
[20] See Appellant's brief, at 24.
[21] As the trial court further explained:

Able counsel for Dr. Doe was an author of the Act and argues that it had certain intents. Our inquiry, however, is what the Legislature intended and for that we look to the language of the Act. We recognize, of course, the essential thrust of the Act for confidentiality of HIV-related information. Its title confirms this. But total focus on confidentiality ignores the premise disclosed in the Findings that the legislative concern that prompted the Act was "controlling the incidence of a disease that is increasing at a significant rate in this Commonwealth." This is the end to which the legislation is directed and the Act declares confidentiality to be one important measure in the effort to effect it. This perception of the Legislature's more vital concern is important in construing the Act.
Trial court opinion, at 9-10. See 35 P.S. § 7602.
[22] For extreme examples, see Doe v. Borough of Barrington, 729 F.Supp. 376, 384 n. 8; 389 (D.N.J.1990). See Gostin, The HIV-Infected Health Care Professional: Public Policy, Discrimination, and Patient Safety, 18 Law, Medicine & Health Care 303 (1990), at 305.
[23] "[P]ublic policy must be based on scientific knowledge and not public perception or fear." Pennsylvania Department of Health Recommendations to the CDC on Proposed Guidelines to Reduce the Risk of Transmission of Bloodborne Pathogens to Patients during Invasive Procedures, March 29, 1991, at 2. See Mishu, B., et al., A Surgeon with AIDS: Lack of Evidence of Transmission to Patients, 264 J.Am. Med.A. 467 (1990); see Possible Transmission of Human Immunodeficiency Virus to a Patient during an Invasive Dental Procedure, 39 MMWR 29 (July 27, 1990), at 492.
[24] We specifically reject the Amicus Curiae contention that after this decision, the public will advance "mere association" with an infected doctor as an actionable injury. Brief of Amicus Curiae, at 48. To alleviate this concern, we stress that where, as here, no risk of harm befalls certain patients, information regarding the HIV-infected physician may not be disseminated to those individuals except as otherwise provided by the Act.