# Commonwealth v. Philip Morris Inc.

226

*Mike Fisher, attorney general,* for the Common-wealth.
*Alice W. Ballard,* for intervenors.

HERRON, *J.,* February 26, 1999—

## I. INTRODUCTION

On January 13, 1999, this court approved consent decrees and final judgments presented by the Commonwealth of Pennsylvania and various defendant tobacco manufacturers to settle and end their landmark lawsuit. This court also denied petitions to intervene by a group of hospitals, Allegheny County, and various private anti-tobacco activists and organizations filed shortly after the settlement agreement was announced in November 1998.

Paradoxically, some of the petitioners stated that they neither opposed the settlement nor sought to participate in it. Rather, they asked this court for an interpretive opinion on whether any future claims against the tobacco defendants could be barred or affected by the release provisions in the settlement agreement (the master settlement agreement or MSA). Alternatively, other pe-

titioners asked this court to delete language from the MSA's release provisions despite protests from the Commonwealth that such revisions might jeopardize the settlement agreement as to Pennsylvania and result in its exclusion from the monetary and non-monetary benefits of the settlement.[1]

Significantly, except for the group of hospitals, all of the other petitioners requested an interpretive opinion without having filed a claim against the tobacco defendants. Moreover, the activists and Allegheny County asserted broad, anticipatory policy arguments against the indemnification scheme within the MSA. They argued, for instance, that it would force the state to come to the defense of the tobacco industry, thereby pitting it against future claims by the activists and Allegheny County. These broad public policy arguments—as distinguished from constitutional arguments or arguments premised on case law or statutes arising in an actual case or controversy—did not present justiciable standards for court review on the record presented by the petitioners.

These petitions, thus, were not based on an actual case or controversy but sought instead an advisory opinion despite a long-standing tenet of jurisprudence against providing them. See generally, *Gabel v. Cambruzzi*, 532 Pa. 584, 592, 616 A.2d 1364, 1369 (1992) (where court lacks sufficient facts to issue anything but an advisory opinion it "will not break its tradition of refusing to author advisory opinions"); *In re Application of Milton*

---

1. During the intervention hearing, counsel for one of the tobacco defendants, Philip Morris, likewise emphasized that the release language in the MSA, especially in section 12, "goes to the heart of why the defendants in this case have paid the very large amount of money and made all of the other agreements, the noneconomic agreements that they have made." N.T. (1/12/99) at 61-62.

*Hershey Medical Center,* 407 Pa. Super. 565, 571, 595 A.2d 1290, 1293 (1991), *aff'd,* 535 Pa. 9, 634 A.2d 159 (1993), quoting *Okkerse v. Howe,* 521 Pa. 509, 520, 556 A.2d 827, 833 (1989) (an advisory opinion is without legal effect); *Suehr v. State Ethics Commission,* 651 A.2d 648, 649 (Pa. Commw. 1994), *alloc. denied,* 541 Pa. 647, 663 A.2d 697 (1995) (where no case or controversy exists, a court should not render an advisory opinion).

The only petitioners who had an actual claim pending—the group of hospitals—had filed their complaint in Allegheny County shortly after the settlement was announced. Any ruling on the impact of the MSA on this claim is both premature and more appropriately decided by the presiding judge in that litigation if, and when, the MSA release provisions are raised.

The precise legal issues raised by these petitions must be carefully defined. The petitions of the activists and Allegheny County, for instance, raise the following issue: Did the petitioners establish a "legally enforceable interest" to intervene in the final, settlement stages of the Commonwealth's highly innovative—but risky— lawsuit based on their concern that the MSA might affect their future (but yet unfiled) actions against the tobacco defendants. The petitioners ultimately failed to establish such an interest because their claims do not present a case or controversy ripe for disposition. The record created during the intervention hearing and in the memoranda as to the inherent limitations within the releases might, however, ultimately prove useful— although a determination of the actual scope of these releases must await an actual case or controversy. There was, moreover, no dispute that the releases would not affect the rights of individuals who suffer tobacco-related injuries from bringing legal actions against the

tobacco defendants to recover for those injuries.[2] Furthermore, the Commonwealth and tobacco defendants indicated that the release would not bar such other claims as requests for injunctive relief.[3]

Several of the petitioners have filed appeals of the orders denying their intervention. The following opinion is therefore entered to address the many concerns and issues raised by the petitioners and to explain the denial of the intervention petitions.

## II. PROCEDURAL BACKGROUND

After months of negotiations,[4] 46 states, the District of Columbia and five territories on November 23, 1998,

2. At the hearing on January 12, 1999, counsel for the Commonwealth made the following representation with no objection by any party present: "Moreover, with regard to what Mr. Fox was just indicating, *the MSA, in no sense, is barred to private litigants who are coming in arguing on their own individual claims with regard to the tobacco defendants. There are many individuals, many claims that are not going to be barred at all by this MSA.* And were the recovery—if there is a recovery, it will indeed be against the tobacco defendants, themselves, not against this fund being accumulated by the Commonwealth that the attorneys general obtained for the various statements (sic)." N.T. (1/12/99) at 58. (emphasis added)

3. At the hearing, the court posed the question of whether the MSA would limit actions to "enjoin certain conduct or activity, assuming one would have a right or standing to bring such an injunction?" N.T. (1/8/99) at 58. Counsel for both the Commonwealth and defendant Philip Morris concurred that the release applied only to certain monetary claims. See N.T. (1/8/99) at 62-63.

4. The tobacco settlement negotiations began in the spring of 1998. According to the Commonwealth, they were "hard fought, and at times were contentious. Indeed, as was well publicized in the press, at different times during the negotiations, parties walked away from the negotiations only to return later and resume bargaining."

executed[5] two agreements to settle their nationwide lawsuits against tobacco manufacturers—the master settlement agreement (MSA) and the smokeless tobacco master settlement agreement (STMSA).[6] In signing these agreements, the Commonwealth of Pennsylvania, through its attorney general, D. Michael Fisher, resolved to end the lawsuit it had filed in April 1997 against various tobacco manufacturers, their public relations agency and the three trade associations created by them (tobacco defendants).[7]

The MSA required each settling state to file a consent decree with its appropriate state court.[8] Consequently, on December 11, 1998, the Commonwealth and tobacco defendants[9] filed joint motions to approve the settlement and consent decrees. Before and after this joint motion was filed, petitions to intervene were filed by individuals

---

Commonwealth's memorandum in support of joint motions to approve the settlements at 5-6.

5. For the execution dates of the agreements, see MSA II(aa) and STMSA II(x). But see Commonwealth's answer to the petition to intervene of Allegheny General Hospital at ¶5 (stating that MSA was executed on November 16, 1998).

6. The MSA submitted to this court was signed by state attorneys general or other state representatives as well as by Philip Morris Inc., R.J. Reynolds Tobacco Co.; Brown & Williamson Tobacco Corp.; Lorillard Tobacco Co.; and the Liggett Group Inc. The STMSA was negotiated with the United States Tobacco Company.

7. See preamble, ¶4 to the MSA consent decree. Complaint, *Commonwealth v. Philip Morris,* April 1997, no. 2443 (Phila. Ct. Com. Pleas) at ¶2.

8. MSA XIII(b)(1)(B) & exhibit L.

9. The "tobacco defendants" who joined in this motion were Brown & Williamson Tobacco Corp. (individually and as successor by merger to the American Tobacco Company); Lorillard Tobacco Company; Philip Morris Inc.; R. J. Reynolds Tobacco Company and the Liggett Group Inc.

and organizations (petitioners) representing a cross-section of interests: private anti-tobacco activists and organizations; not-for-profit hospitals that had filed a complaint against tobacco manufacturers seeking recovery, inter alia, of unreimbursed healthcare costs of Medicaid recipients,[10] and Allegheny County. In addition, the City of Philadelphia filed an amicus brief to assist the court in evaluating the MSA.[11] A common bond among these petitioners was an assertion that they did not oppose the MSA in general;[12] they were, however, deeply concerned that release and offset provisions within the MSA might stifle or destroy their right to bring effective legal actions against the tobacco defendants in the future—even though the petitioners were not signatories to the settlement agreement.

The issues raised by the petitioners—whether they should be granted leave to intervene because release provisions in the MSA might affect any future action against the tobacco defendants—were serious. During the intervention hearings that were held on two separate days, this court sought to raise and address the concerns raised by the petitioners. Ultimately, upon consideration

---

10. Hospitals' memorandum of law at 5.

11. For a brief discussion of the city's position, see note 62, *infra*.

12. See *e.g.*, petition to intervene filed by Citizens for Consumer Justice, Coalition for Tobacco Free Pennsylvania, American Academy of Pediatrics, Clean Air Council and Smoke-Free Educational Services at 2 ("Petitioners do not seek to block the proposed settlement in this petition") (joining with other petitioners ACSH, Sklaroff, Godshall, Barg, SmokeFree Pennsylvania and PennPIRG). During the intervention hearing, the hospitals' counsel stated: "And we are not asking to upset the master settlement agreement or proposed consent decree, all we are asking for is an additional contemporaneous order with an additional finding by the court that we are not covered by the language." N.T. (1/8/99) at 10.

of the testimony at the hearings, the documents submitted by all parties and petitioners, and the relevant precedent, this court concluded that the petitions to intervene should be denied for the reasons set forth below as to each petitioner.

## III. THE SETTLEMENT AGREEMENT[13]

The master settlement agreement negotiated by the Commonwealth and tobacco defendants is massive and complex, numbering 147 pages with 21 exhibits. In presenting this agreement, the Commonwealth and tobacco defendants emphasize that it will provide the following relief resulting in "far-ranging changes in the tobacco industry's business practices, advertising and marketing:

"Prohibits the direct or indirect targeting of minors in the advertising, promotion, or marketing of tobacco products.

"Bans use of cartoons in advertising, marketing, and packaging.

"Restricts brand name sponsorships.

"Removes and bans all tobacco billboards.

"Removes and bans all transit tobacco advertising.

"Bans payment for product placement in movies as well as in television shows, theatrical performances, live theater, recorded performances, and video games.

"Restricts distribution of free samples to adult-only facilities.

"Requires proof of age for distribution of free gifts.

---

13. Because the petitions to intervene addressed only the MSA, this court will likewise limit its discussion of the "settlement agreement" to the MSA.

"Restricts the use of brand names by third parties and requires tobacco companies to enforce their trademarks.

"Bans the use of nationally recognized brand names as names of future tobacco products.

"Establishes a minimum pack size of 20 cigarettes until December 31, 2001 . . . .

"Dissolves the Tobacco Institute, The Council for Tobacco Research, and the Council for Indoor Air Research, and mandates that future trade associations do not act like those of the past.

"Restricts lobbying against laws that limit non-tobacco products that look like tobacco products (*e.g.,* bubble gum).

"Establishes a user friendly searchable web site of all industry produced documents.

"Establishes a counter-advertising fund and education foundation of at least $1.45 billion, which includes $250 million to fund the study of youth smoking.

"Establishes a $50 million enforcement fund with the National Association of Attorneys General." Commonwealth's settlement memorandum at 3-4.

These concessions by the tobacco defendants, the parties assert, are a major accomplishment because they exceed the kind of injunctive relief that this court would have been able to extend in light of First Amendment and other constraints. *Id.* at 4. Indeed, the difficulties in limiting tobacco advertising, even when aimed at minors, was demonstrated recently by a federal district court judge's decision to strike down a New York City ordinance entitled the "Youth Protection Against Tobacco Advertising and Promotion Act." This law limited, inter alia, outdoor advertising for tobacco products in the vicinity of schools, playgrounds and other places

children gather. The court struck down this local law on federal preemption grounds without even reaching the thorny First Amendment issues. *Greater New York Metropolitan Food Council Inc. v. Giuliani,* 1998 U.S. Dist. Lexis 19498 (Dec. 15, 1998). In contrast, the significant benefits secured by the MSA agreement were underscored by one commentator who observed that "since most outdoor cigarette advertising is to end under the nationwide settlement with tobacco companies, that part of the law would have been largely irrelevant." [14]

In addition to these voluntary restraints on the tobacco industry's marketing initiatives, the MSA will bestow on the settling states an unprecedented financial recovery. Under these agreements, the tobacco industry is required to pay to the states "$206 billion dollars over 25 years." In the course of these 25 years, Pennsylvania will receive $11.26 billion with the potential of payments of "over $500 million per year thereafter." Indeed, Pennsylvania's share of the total recovery represents "the third highest recovery among the settling

---

14. Abby Goodnough, "Law Limiting Cigarette Ads is Overturned," *N.Y. Times,* December 16, 1998 at B1. See MSA §III(d) ("Elimination of Outdoor Advertising and Transit Advertisements"). Similarly, Judge Sosman of the Commonwealth of Massachusetts Superior Court, in approving the MSA, emphasized that it achieved by compromise advances unavailable through court orders: "In many respects, whatever their weaknesses, the injunctive provisions in this consent decree and in this master settlement agreement go beyond what I believe I could have done even had I found ongoing unfair and deceptive trade practices. I would have had to deal, obviously, with very significant First Amendment concerns in drafting any orders with regard to outdoor advertising, sponsorship of sports events, use of sports figures' names in brand names, and the whole host of detail that is contained in this MSA." *Commonwealth of Massachusetts v. Philip Morris,* no. 95-7378 (Sup. Ct.); transcript (12/3/98) at 16-17, exhibit A to Philip Morris's answer to the petition to intervene of Sklaroff.

states." [15] These massive sums of money hold the promise of inestimable benefits for the citizens of Pennsylvania. Not surprisingly, when this settlement agreement was initially offered to the 46 states as an option to continuing their lawsuits against the tobacco manufacturers, all 46 states decided to sign the agreement.[16]

The parties emphasize that they are not required by the Rules of Civil Procedure to seek court approval and the entry of a consent decree in this case.[17] However, the MSA requires certain uniform procedures in each settling state that will be facilitated by the entry of consent decrees creating "continuing jurisdiction in this court to adjudicate any interpretation issues and issues of enforcement that may arise as they apply to Pennsylvania." [18] As of December 10, 1998—the day before the parties filed their motion for the court's approval of the consent decree—courts in 20 other states had approved the settlement and entered the consent decrees.[19] Before this court could consider approving the MSA, however, it was necessary to address the issues raised by the intervention petitions.

15. Commonwealth's settlement memorandum at 2 & n.1.

16. *Id.* at 4-5.

17. See *id.* at 6 (citing Pa.R.C.P. 229).

18. Commonwealth's settlement memorandum at 6.

19. Commonwealth's settlement memorandum at 5. The courts that had approved the consent decree as of December 10 were New Jersey, Ohio, Michigan, Illinois, Maine, Massachusetts, Connecticut, Maryland, Wisconsin, Iowa, Kansas, California, Oklahoma, Colorado, Arizona, Montana, Idaho, Washington, Oregon and Georgia. *Id.* at 5 n.2.

## IV. PETITION TO INTERVENE OF THE NOT-FOR-PROFIT HOSPITALS

A group of 16 Pennsylvania not-for-profit hospitals filed a petition to intervene for declaratory relief "to determine whether the MSA affects the claims set forth" in a complaint that they had filed against various tobacco defendants on December 10, 1998 in Allegheny County." [20] In filing their Allegheny County complaint, the hospitals seek to recover the "unreimbursed cost of health care services" that they provided to the "state's Medicaid and medically indigent patients" as a result of tobacco-related injuries.[21]

The hospitals claim that they may intervene in the remaining phases (*i.e.,* settlement) of the Commonwealth's action against the tobacco defendants because the hospitals have a "legally enforceable interest" as set forth in Pa.R.C.P. 2327(4) that may be affected by the release provisions in the MSA:

"Proposed intervenors have legally enforceable interests at stake insofar as the MSA and consent decree *may* affect their ability to assert, and obtain recovery for, claims they have and/or may have against the settling defendants. Proposed intervenors have a further interest in any damages awarded pursuant to the MSA and consent decree that relate to tobacco attributable health care costs for Medicaid recipients and the medically indigent. Hospitals' memorandum at 3. (emphasis added)

More specifically, the hospitals sought from this court a declaration of their rights under the MSA:

20. Hospitals' petition to intervene at ¶7.
21. Hospital's petition to intervene at ¶4.

"Specifically, *they ask this court to determine whether the MSA and/or consent decree release or bar proposed intervenors' claims against the tobacco defendants in their separately filed action in Allegheny County.* Second, *if this court determines that the proposed consent decree does in fact release their claims,* then the proposed intervenors ask this court to determine what rights the proposed intervenors have under the MSA and the consent decree, including what rights they have to the proceeds of the settlement terminating their claims." [22]

## A. *The MSA Release Provisions at Issue*[23]

The hospitals argue that the claims set forth in their Allegheny County complaint against the tobacco defendants might become ensnared in the broad definitions for "claims" and "released claims" set forth in the MSA. The term "claims," for instance, includes all "claims" whether "legal, equitable, or statutory." [24] The definition of " 'released claims' includes the claims set forth in exhibit D to the MSA, *or any comparable claims* that . . . could be . . . asserted . . . *in any comparable action* . . . by a . . . 'releasing party.' " [25] Because

---

22. Hospitals' memorandum at 3. (emphasis added) During the hearing, the hospitals' counsel explained that their primary concern was that the MSA release provisions would bar their Allegheny County action: "we would be very happy just to be told releasing bar provisions don't apply for us, and we will go off and litigate our cause of action somewhere else." N.T. (1/8/99) at 15.

23. The specific provisions the hospitals address within the MSA include its definition of "claims," MSA §II(n), "released claims," MSA §II(nn), "releasing parties," MSA §II(pp), its "release, discharge & covenant provisions," MSA XII, and paragraph VII of the consent decree. Hospitals' memorandum at 9-12.

24. Hospitals' memorandum at 9, quoting MSA §II(n). (emphasis in hospitals' petition)

25. Hospitals' memorandum at 9, quoting MSA §II(nn). (emphasis in hospitals' petition)

of this broad language, the hospitals argue, the hospitals' claims against the tobacco defendants *may fall* within the definition of "released claims." Hospitals' memorandum at 9.

The hospitals are also concerned that the following broad definition of "releasing parties" in the MSA might include them:

"[T]o the full extent of the powers of the signatories hereto to release past, present and future claims, the following: (1) any settling state's subdivisions (political or otherwise including but not limited to, municipalities, counties . . . and hospital districts) . . . and (2) *persons or entities acting in a parens patriae . . . or in any other capacity, whether or not any of them participate in this settlement . . .* (B) *to the extent that any such entity (as opposed to an individual) is seeking recovery of health care expenses . . . paid or reimbursed, directly or indirectly, by a settling state.*" Hospitals' memorandum at 10 (quoting MSA §II(pp)). (emphasis in original)

Finally, the hospitals urge this court to consider the broad implications of section 7 of the consent decree and section XII of the MSA, the settling states' release, discharge and covenant because "[m]ost, if not all, of the provisions of this section *could be* interpreted to affect rights of the proposed intervenors." Hospitals' memorandum at 10. (emphasis added) The hospitals suggest that their rights might be affected by the following language in section XII(a) because of the broad definition of "releasing party" in the MSA:

"(1) Upon the occurrence of state specific finality in a settling state, such settling state shall absolutely and unconditionally release and forever discharge all released parties from all released claims that the *releasing parties directly, indirectly, derivatively or in*

*any other capacity ever had, now have, or hereafter can, shall, or may have. . . .*

"(3) Each settling state *(for itself and for the releasing parties)* further covenants and agrees that it *(and the releasing parties)* shall not . . . sue or seek to establish civil liability against any released party . . . and further agree that such covenant and *agreement shall be a complete defense to any such civil action or proceeding.* MSA §XII(a), (as quoted by hospitals' memorandum at 10-11).

Finally, the hospitals are concerned that the following provisions in section XII(b) "could" operate to bar their claims:

"(b) *Releasing claims against released parties.*

"*If a releasing party* (or any person or entity enumerated in subsection II(pp), *without regard to the power of the attorney general to release claims of such person or entity)* . . . nonetheless *attempts to maintain a released claim* against a released party . . . *The released party may offer the release and covenant as a complete defense.*[26]

## B. *Applicable Standards for Intervention*

The criteria for intervening in a pending action are set forth in the Pennsylvania Rules of Civil Procedure 2326 through 2329. Pa.R.C.P. 2327, for instance, pro-

---

26. Hospitals' memorandum at 11 (quoting MSA §XII(b)). In quoting this section, the hospitals chop off sentences and omit passages that could prove relevant if reviewed in the context of a specific case. This provision, for instance, also states that the released party will defend any action against it "[i]f it is determined at any point in such action that the release of such claim is unenforceable or invalid for any reason *(including, but not limited to, lack of authority to release such claim)* . . . ." MSA §XII(b)(1).

vides in relevant part that intervention should be permitted if:

"(3) such person could have joined as an original party in the action or could have been joined therein; or

"(4) the determination of such action may affect any legally enforceable interest of such person whether or not he may be bound by a judgment in the action." Pa.R.C.P. 2327.

The rules further provide that a hearing be held to consider a petition to intervene. Pa.R.C.P. 2329. The court may then either allow intervention or refuse it if the following conditions exist:

"(1) the claim or defense of the petitioner is not in subordination to and in recognition of the propriety of the action; or

"(2) the interest of the petitioner is not already adequately represented; or

"(3) the petitioner has unduly delayed in making application for intervention or the intervention will unduly delay, embarrass or prejudice the trial or adjudication of the rights of the parties." Pa.R.C.P. 2329.

In the instant case, the hospitals seek to intervene based on both Pa.R.C.P. 2327(4), which allows intervention if they can show a "legally enforceable" interest in that action, and on Pa.R.C.P. 2327(3).

## C. The Hospitals Fail To Establish the Requisite "Legally Enforceable Interest"

The standard for determining a "legally enforceable interest" for intervening in a pending action under 2327(4) is not as straightforward as it might at first appear. As the Pennsylvania Supreme Court has long emphasized, "the exact boundaries of the 'legally en-

forceable interest' limitation [of Pa.R.C.P. 2327(4)] are not clear." Consequently, "[t]he result is a flexible, although uncertain rule whose application in a given case calls for a careful exercise of discretion and consideration of all the circumstances involved." *Pennsylvania Crime Commission Subpoena,* 453 Pa. 513, 520, 309 A.2d 401, 406 (1973); *Pennsylvania Railroad Co. v. Hughart,* 422 Pa. 615, 618, 222 A.2d 736, 738 (1966). (citations omitted) In applying this rule, it is thus necessary to analyze the exact nature of the "legally enforceable interest" that the hospitals claim "may be" affected by the MSA within the context of the Commonwealth's action against the tobacco defendants.

In arguing that the potential effect of the release provisions in the MSA constitutes a legally enforceable interest under Pa.R.C.P. 2327(4), the hospitals cite cases outlining the standards for intervening under this rule. Hospitals' memorandum at 7-8. The facts of these cases, however, are clearly distinguishable from the hospitals' essentially hypothetical concerns about the potential impact of the MSA on their Allegheny County action. This case-by-case analysis is necessary in light of the fact-sensitive standard for determining whether a petitioner has presented a "legally enforceable interest" sufficient to allow intervention.

In four of the five cases cited by the hospitals, the intervenors' interest in the underlying action was patent. Thus, in *Bannard v. New York State Natural Gas Corp.,* 404 Pa. 269, 172 A.2d 306 (1961), the Pennsylvania Supreme Court concluded that the owner of a parcel of land (*i.e.*, the Pennsylvania Game Commission) could intervene in an action of ejectment that was filed against its tenant. The court observed, however, that this right to intervene was premised on the Act of 1915 rather than Rule 2327. *Id.,* 404 Pa. at 281, 172 A.2d at 312.

Similarly, in *Tremont Township School District v. Western Anthracite Coal Co.,* 381 Pa. 276, 113 A.2d 234 (1955), the Pennsylvania Supreme Court concluded that the county had a legally enforceable interest and could intervene in an action to attach royalties collected from coal mined from the county's property. The Supreme Court in *Bily v. Allegheny County Board of Property Assessment,* 353 Pa. 49, 44 A.2d 250 (1945) concluded that a mortgagee who foreclosed on her property and purchased it at a sheriff's sale should have been allowed to intervene as the new owner of the property during tax appeal proceedings relating to her property. Finally, in *Commonwealth, Department of General Services v. Weinberger Co.,* 65 Pa. Commw. 201, 441 A.2d 1341 (1982), a subcontractor was permitted to intervene in an action brought by his contractor to recover for payments due where the subcontractor's payments were withheld by the contractor pending resolution of the litigation.

In a fifth intervention case cited by the hospitals, the court held that intervention should not be allowed. See *e.g., Marion Power Shovel Co. v. Fort Pitt Steel Casting Co.,* 285 Pa. Super. 45, 426 A.2d 696 (1981). In *Marion Power,* a striking union and its members sought to intervene in a replevin action brought against their employer/manufacturer by a customer/company that wanted to seize possession of steel castings manufactured by the union members' employer. The union asserted a legally enforceable interest in the steel castings because of "incentive wages" that might have been due to them on the castings. The *Marion Power* court, however, rejected this argument, noting that the union "neither claims nor could claim the right" to possess the castings, which it needed solely as a basis to calculate

incentive wages. *Id.,* 285 Pa. Super. at 55, 426 A.2d at 701.

In all of these cases where the courts allowed intervention, the proposed intervenors' interests in the underlying action were clear and direct as either property owners or subcontractors, whose interests were clearly at issue in the underlying action. None of these cases, therefore, bears a close factual similarity to the hospitals' request for an interpretation of the potential effect of the MSA release provisions. It must be noted, of course, that these cases are also distinguishable because the hospitals are requesting a declaratory judgment. Nonetheless, precedent construing the Declaratory Judgments Act likewise establishes that the hospitals could not intervene in the Commonwealth's case because their claims are too remote and fail to present an actual case or controversy ripe for adjudication.

D. *The Hospitals' Request for Declaratory Relief Fails To Present an Actual Case or Controversy Ripe for Disposition*

In their petition to intervene, the hospitals seek a declaratory judgment and properly attached a copy of their proposed pleading as required by Pa.R.C.P. 2328. In this complaint in action for declaratory judgment, the hospitals invoke the Declaratory Judgments Act and assert that this court has jurisdiction under 42 Pa.C.S. §7532.[27] Section 7532 provides:

"Courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." 42 Pa.C.S. §7532.

---

27. Hospitals' petition to intervene, exhibit A; intervenors' complaint in action for declaratory judgment, ¶¶3-4.

Despite this broad language, courts interpreting the Declaratory Judgments Act have emphasized the need for a case or controversy before a court may act pursuant to this Act. Thus, "[a]lthough the Declaratory Judgments Act is to be liberally construed," the Commonwealth Court recently observed, "one limitation on a court's ability to issue a declaratory judgment is that the issues involved must be ripe for judicial determination, meaning that there must be the presence of an actual case or controversy." *Pennsylvania State Lodge, Fraternal Order of Police v. Commonwealth, Department of Labor & Industry,* 692 A.2d 609, 613 (Pa. Commw. 1997), *aff'd,* 550 Pa. 549, 707 A.2d 1129 (1998). The Pennsylvania Supreme Court likewise emphasized:

"Only where there is a real controversy may a party obtain a declaratory judgment. . . .

"A declaratory judgment must not be employed to determine rights in anticipation of events which may never occur or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove to be purely academic." *Gulnac v. South Butler County School District,* 526 Pa. 483, 488, 587 A.2d 699, 701 (1991). (citations omitted)

Thus, in *Fraternal Order of Police v. Department of Labor, supra,* the Commonwealth Court dismissed the FOP's petition for a declaratory judgment that amendments to the Pennsylvania Workers' Compensation Act were unconstitutional because its new offset provisions would have an "adverse actuarial impact" on their pension plans. In so doing, the court explained that the FOP did not allege any facts that demonstrate "any actual and immediate harm" from these amendments. Thus, the FOP "has presented no case or controversy between the parties for which we are empowered to declare rights." *Id.,* 692 A.2d at 611, 613-14.

See also, *Pennsylvania State Lodge of Fraternal Order of Police by Bascelli v. Commonwealth,* 131 Pa. Commw. 611, 613-14, 571 A.2d 531, 532 (1990), *aff'd,* 527 Pa. 363, 591 A.2d 1054 (1991) (the FOP's petition for declaratory judgment that certain pension laws violated the Pennsylvania Constitution's authorization of collective bargaining was dismissed where the FOP failed to allege that any contract with the Commonwealth had not been enforced because of the challenged statutes); *Pennsylvania Gamefowl Breeders Association v. Commonwealth,* 533 A.2d 838, 840-41 (Pa. Commw. 1987) (petition for declaratory relief denied because Gamefowl Breeders failed to state a case or controversy ripe for review and "a declaratory judgment will not be entered in anticipation of events that have not occurred or may never occur").

A series of three cases, presenting facts and issues analogous to those raised by the hospitals' petition, are also instructive. See *Brown, Administratrix of the Estate of Zimmerman v. Commonwealth, Liquor Control Board,* 673 A.2d 21 (Pa. Commw. 1996), *appeal denied,* 546 Pa. 648, 683 A.2d 886 (1996); *Avrich v. General Accident Insurance Co.,* 367 Pa. Super. 248, 532 A.2d 882 (1987); *Boyle v. Commonwealth, Department of Transportation,* 151 Pa. Commw. 430, 617 A.2d 70 (1992). In *Brown, Administratrix of the Estate of Zimmerman v. Commonwealth, Liquor Control Board,* 673 A.2d 21 (Pa. Commw. 1996), an administratrix of Zimmerman's estate brought a wrongful death action after he was killed in an automobile accident with intoxicated students. The administratrix named various defendants, including the students, the Pennsylvania Liquor Control Board, and the Pennsylvania Department of Transportation.

While this action was pending, the Zimmerman administratrix also brought a declaratory judgment action

seeking a determination as to the maximum amount the estate might recover in its action. Under 42 Pa.C.S. §§8522 and 8528, the maximum amount a plaintiff could recover as to Commonwealth parties was $250,000. The administratrix apparently wanted to bypass this limitation with a declaratory judgment that the PLCB and PennDOT were each liable for a maximum of $250,000. The Commonwealth Court concluded, however, sua sponte, that it could not consider this issue because there was no case or controversy until a judgment in excess of $250,000 was entered against both the PLCB and PennDOT. "While both this court and the trial court have the power to determine the statutory limits of liability on commonwealth parties," the *Zimmerman* court observed, *"we do not have the ability to grant any relief that is merely advisory, one that does not involve any case or controversy. Any action, including a declaratory judgment action, may not be employed to determine rights in anticipation of events which may never occur* or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove purely academic." [28]

Such an opinion, the court emphasized, would have been academic because the plaintiff had not yet achieved any judgment against the defendants. Her case was not ripe because of a variety of contingencies: "it was possible that both commonwealth parties may be found liable, only one of the commonwealth parties will be found liable, or neither" would be found liable.[29]

---

28. *Zimmerman,* 673 A.2d at 23. (emphasis added)

29. *Zimmerman, supra,* 673 A. 2d at 24. Accord *Avrich v. General Accident Insurance Co.,* 367 Pa. Super. 248, 532 A.2d 882 (1987) (declaratory judgment petition dismissed for failure to present an actual controversy where it sought a determination of the defendants' insurers' obligation to pay prior to the entry of any judgment); *Boyle*

Similar unknown contingencies bedevil the petitioning hospitals—and indeed all litigants. What they are seeking is determination of an issue that is not actual: whether a contractual defense *might* be raised against them in a different proceeding. As counsel for the tobacco defendants suggested during the hearing, it could be sometime before this defense is asserted—if ever—in an answer to the hospitals' complaint. Prior to that, the tobacco defendants "no doubt"[30] will file preliminary objections—with their inherently uncertain impact on the hospitals' claims. Yet another possible contingency is that a court—at the appropriate stage in the proceeding—might conclude that the releases in the MSA have no impact whatsoever in the hospitals' Allegheny County claim. For this reason, the hospitals' petition is not ripe; this court cannot interpret the MSA in a vacuum without presenting an advisory opinion without legal effect. See *e.g., Gulnac v. South Butler County School District,* 526 Pa. 483, 487, 587 A.2d 699, 701 (1991) (the court erred in unnecessarily deciding a constitutional issue in a vacuum, thereby rendering "an advisory opinion which our courts are not entitled to do"). But cf. *Reichley by Wall v. North Penn School District,* 533 Pa. 519, 626 A.2d 123 (1993) (distinguishing the facts of *Gulnac*). See generally, *Ga-*

---

*v. PennDOT,* 151 Pa. Commw. 430, 617 A.2d 70 (1992) (declaratory judgment action dismissed which sought a determination that the statutory cap on a recovery from PennDOT is unconstitutional because no judgment had been entered in favor of petitioner). But see *Bromwell v. Michigan Mutual Insurance Co.,* 716 A.2d 667, 670 (Pa. Super. 1998) (declaratory judgment action to determine the scope of liability of defendants' insurers could be maintained where settlement agreement specifically provided for such an action to determine relative liability).

30. See *e.g.,* N.T. (1/8/99) at 37.

*bel v. Cambruzzi,* 532 Pa. 584, 592, 616 A.2d 1364, 1369 (1992) (where court lacks sufficient facts to issue anything but an advisory opinion, it "will not break its tradition of refusing to author advisory opinions"); *In re Application of Milton S. Hershey Medical Center,* 407 Pa. Super. 565, 571, 595 A.2d 1290, 1293 (1991), *aff'd,* 535 Pa. 9, 634 A.2d 159 (1993), quoting *Okkerse v. Howe,* 521 Pa. 509, 520, 556 A.2d 827, 833 (1989) (an advisory opinion is without legal effect).

### E. *The Practical Effect of the Hospitals' Premature Constitutional and Substantive Arguments Is To Undercut Their Claimed "Legally Enforceable" Interest To Intervene*

There is yet another reason why the hospitals' petition to intervene was denied. The thrust of the hospitals' argument for intervention is that the sweeping language of the MSA release provisions "could be interpreted to affect the rights of the proposed intervenors." Hospitals' memorandum at 10. After outlining the provisions of the MSA that might affect them, the hospitals then present formidable arguments as to why these provisions do not encompass their Allegheny County claims.

They assert, for instance, that their constitutionally protected right of access to the courts and their right to be free from governmental taking of property without due process or just compensation would be violated by such a sweeping interpretation of the MSA. Hospitals' memorandum of law at 13-15. They further argue that the attorney general lacks the authority to release the hospitals' claims under the "Commonwealth Attorneys' Act," 71 P.S. §732-201 et seq.[31] Finally, the hospitals assert the general rule that settling parties and court

---

31. Hospitals' memorandum at 25-26; N.T. (1/8/99) at 21.

approved settlement agreements may not dispose of third parties' claims without their consent.[32] The practical effect of such arguments, ironically, is to undercut their initial assertion that they must be allowed to intervene based on the negative impact of the MSA release provisions on the hospitals' claims.

Both the Commonwealth and the tobacco defendants are careful not to address these substantive arguments in their memoranda. Rather, they suggest that such arguments are premature. During the intervention hearing, however, the settling parties were more forthcoming as to the scope of the releases and consent decree. In response, for instance, to questioning as to the effect of the releases on the hospitals' claims, counsel for the Commonwealth stated that he did "not believe it was the intention of the attorney generals of 50 states to release those claims." N.T. (1/8/99) at 26. When asked to elaborate as to whether Attorney General Fisher released the hospitals' claims, he responded: "The agreement expressly says we did not release claims of private organizations for claims that we did not assert. *Unreimbursed costs are not claims that we asserted.*" N.T. (1/8/99) at 28. He further stated:

"I would say the general concept was the attorney general's—we're agreeing to release quasi-sovereign public claims for reimbursed costs for tobacco-related illness period.

"But they were also expecting through certain claims that might get filed that might be directly or indirectly reimbursed claims for tobacco-related illness would also be released.

"So you get into the directly or indirectly language, you get into the need to go behind the pleading, and

---

32. Hospitals' memorandum at 27; N.T. (1/8/99) at 22-23.

I am assuming that if I had checked out all the charters of these hospitals they would be about totally private organizations.

"We were not intending, at the time the discussions took place, to release private claims of private hospitals that were not, in effect, claims for reimbursement but were unreimbursed costs." N.T. (1/8/99) at 28-29.

This statement was offered, however, with the cautionary note that these issues would have to be raised—and resolved—after the defense was actually asserted in the context of a particular case. *Id.* This point is ultimately convincing since otherwise this court would be forced to make an anticipatory ruling without the requisite facts.

The hospitals were also concerned that court approval of section VII of the consent decree might be interpreted as finding that "the attorney general has full and complete authority to bind everyone set forth in the MSA." [33] At the hearing, this court therefore asked counsel for tobacco defendant Philip Morris: "would you agree that if the attorney general, at (sic) any given state, did not have the authority to release particular claims that are specifically mentioned within the MSA, that the court does not approve a release of those claims." She responded affirmatively. [34]

### F. *The Hospitals Have Not Established Intervention Under Pa.R.C.P. 2327(3)*

As an alternative basis for intervention, the hospitals argue in their motion and memorandum that they can

---

33. Hospitals' memorandum at 12. See also, N.T. (1/8/99) at 16.

34. N.T. (1/12/99) at 71. It should be noted that defense counsel also steadfastly argued that any discussions of the effect of the release on the hospitals' claim were premature. See *e.g.,* N.T. (1/8/99) at

intervene under Pa.R.C.P. 2327(3) which allows intervention if "such person could have joined as an original party in the action or could have been joined therein." The rule for permissive joinder provides:

"Persons may join as plaintiffs who assert any right to relief jointly, severally, separately, or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences if any common question of law or fact affecting the rights to relief of all such persons will arise in the action." Pa.R.C.P. 2229.

The Commonwealth, in contrast, denies that the hospitals could have joined as original parties in their action because of profound differences in their complaints and causes of action.[35] The Commonwealth filed its complaint in April 1997 in its capacity as sovereign and as parens patriae on behalf of all of its citizen[36] alleging, inter alia, that the defendants disregarded and violated the laws and public policy of Pennsylvania to market their cigarettes and other tobacco products to Penn-

---

38. See generally N.T. (1/12/99) at 63, 67. For a discussion of the scope of a consent decree, see section VII, *infra.* Counsel for the Commonwealth likewise affirmed that court approval of the consent decree did not extend the attorney general's inherent power to release claims by Allegheny County:

"The Court: Do those orders contemplate this court approving the attorney general's authority to compromise county claims?

"Mr. Fox: Not at all, your honor. What we always seem to lose sight of, here, is that paragraph pp of the MSA, which is the definition of releasing parties, clearly and expressly states that 'That release is only applicable to the full extent of the power of the signatories hereto to release past, present and future claims.' " N.T. (1/12/99) at 38, 39.

35. Response of Commonwealth to the hospitals' petition at ¶12.

36. Complaint, *Commonwealth v. Philip Morris,* April Term 1997, no. 2443 (Phila. Ct. Com. Pleas), ¶15.

sylvania's children. Moreover, it alleged that the tobacco defendants purposefully manipulated the nicotine levels in their products to addict the citizens of Pennsylvania.[37] In filing this action, the Commonwealth sought to recover for the state's expenditures for medical assistance provided through Pennsylvania's Medicaid and General Assistance Program for treatment of tobacco-related injuries.[38] It also sought punitive damages, civil penalties, injunctive and other equitable relief.

The hospitals, in contrast, brought their action as "not-for-profit-corporations" to recover their "unreimbursed costs for health care provided in the past, healthcare currently being provided and future health care to be provided to Medicaid, medically indigent patients" suffering from tobacco-related injuries.[39]

During the intervention hearing, the hospitals conceded that they had not joined in the Commonwealth's action earlier because initially their claims seemed significantly different—until the hospitals learned of the broad release provisions in the MSA:

"The Court: The Commonwealth in the settlement proposes to recover sums representing the payment of medical expenses. The hospitals propose to recover what they didn't receive by way of providing care to Medicaid indigents and non-paying patients for tobacco-related health treatment. The damages don't seem the same.

"Mr. O'Rourke: They're not exactly the same.

"The Court: How is there any similarity at all? I don't see any similarity.

---

37. *Id.* at ¶¶3-4.

38. *Id.* at ¶14.

39. Complaint, *Allegheny General Hospital v. Philip Morris,* (Allegheny Cty), ¶¶1-4. See also, N.T. (1/8/99) at 25.

"Mr. O'Rourke: *That's why we didn't intervene in the attorney general's action.* But when it does come to release provisions whether or not the damages are identical in the Commonwealth's brief on pages 4 and 5 they talk about the differences in our damages." N.T. (1/8/99) at 7-8. (emphasis added)

Later in the hearing, the hospitals' counsel explained that they did not attempt to intervene earlier in the Commonwealth's action because of the distinctions between that action and the hospitals' claims against the tobacco defendants:

"To answer the other parts of the questions as to why we delayed, that's precisely why we delayed. We had no reasonable idea that our damages were implicated in this lawsuit and we entered only when this language popped up in the master settlement agreement." N.T. (1/8/99) at 14.

The hospitals also make this point in their memorandum: that it is the MSA and the consent decree that "create the common questions of law and fact" that would allow them to intervene in the Commonwealth's action. Hospitals' memorandum at 20. Yet, for the reasons previously stated, the relief requested by the hospitals—an interpretation of the release provisions of the MSA in a vacuum before it has been raised against them—is not yet ripe. To address their concerns at this point would result merely in an advisory opinion without legal effect. See *Gulnac v. South Butler County School District,* 526 Pa. 483, 487, 587 A.2d 699, 701 (1991) (trial court erred in issuing an advisory opinion "which our courts are not entitled to do"). But cf. *Reichley by Wall v. North Penn School District,* 533 Pa. 519, 626 A.2d 123 (1993) (distinguishing the facts of *Gulnac*).

## G. *Comity Concerns*

Finally, another problem with the hospitals' request to intervene must be noted. The hospitals elected to file their lawsuit against the tobacco defendants in the Allegheny County Court of Common Pleas. They fail to explain why this court in Philadelphia County should intrude and decide the scope of the MSA release in advance of the filing of any answer that asserts a defense based on the MSA. Such an intrusion invites chaos, forum shopping and ignores all procedural precedent much less the comity among our state courts and the associated deliberative process observed by both forums with respect to matters pending.

## V. PETITIONS TO INTERVENE BY PRIVATE ANTI-TOBACCO ACTIVISTS AND ALLEGHENY COUNTY

The County of Allegheny[40] as well as various public activist organizations and individuals[41] filed petitions to intervene in this case both individually and on behalf

---

40. This opinion addresses the Allegheny County petition and memorandum filed on January 7, 1999.

41. An amended petition to intervene was filed December 2, 1998 by Robert B. Sklaroff, William T. Godshall, Jeffrey Barg, SmokeFree Pennsylvania and PennPIRG. A petition to intervene was filed on December 8, 1998 by the American Council on Science and Health. On December 11, 1998, the Citizens for Consumer Justice, Coalition for A Tobacco-Free Pennsylvania, American Academy of Pediatrics, Clean Air Council, and Smoke Free Educational Services filed a petition to intervene. Finally, On January 6, 1999, a petition to intervene was filed by the American Association of Public Health Physicians; Tri-County Tobacco Free Coalition Inc.; American Society of Addictive Medicine; Coalition for Leadership, Education and Advocacy for Recovery; and Peoples Medical Society.

of a similarly situated class ("private anti-tobacco activists" or "activists").[42]

In contrast to the hospitals, the activists and Allegheny County do not have any pending action against the tobacco defendants. They argue, however, that they should be permitted to intervene because the broad definition of "releasing parties" in the MSA II(pp) and the release/indemnification provisions in MSA XII,[43] could affect any future claims against the tobacco defendants. They thus assert that approval of the MSA "may affect legally enforceable interests" of the petitioners.[44] Unfortunately, neither the county nor the activists cited a single case in their petitions or memoranda to assist the court in determining whether they have,

---

42. In their memorandum, these petitioners characterized themselves as "private anti-tobacco activists." At the hearing, their counsel acknowledged the similarity of their positions when asked if they should be treated as a group: "That's right, your honor. They're essentially the same and we are in this together." N.T. (1/8/99) at 40. These activists filed four separate petitions which are virtually identical. For ease of citation, references to the petitions will be to the amended petition filed at control number 112221 by Robert Sklaroff, William Godshall, Jeffrey Barg, SmokeFree Pennsylvania and PennPIRG (and responses thereto).

A procedural issue raised by the activists' petition is the request to intervene on behalf of a similarly situated class pursuant to Pa.R.C.P. 1702. Petition by Sklaroff at ¶¶6-10. Certification of a class action can pose considerable time delays, which could prejudice the settling parties.

43. Counsel for the activists emphasized their concern not only with the definition of "releasing parties" but also "what we are complaining about is the offset provision which takes away our ability to sue or threaten to get a punitive damages award against the tobacco companies." N.T. (1/8/99) at 64-65. See also, N.T. (1/12/99) at 80-81.

44. See e.g., Allegheny County's petition at ¶1; petition to intervene of Sklaroff at ¶11.

in fact, asserted a legally enforceable interest. The Pennsylvania Supreme Court has emphasized, however, that because the "exact boundaries of the 'legally enforceable interest' limitation [of Pa.R.C.P. 2327(4)] are not clear," its application in a particular case "calls for the careful exercise of discretion and a consideration of all the circumstances involved." *Pennsylvania Crime Commission, supra,* 453 Pa. at 520, 309 A.2d at 406. It is thus necessary to analyze the petitioners' asserted interests within the context of the applicable rule and precedent.

The definition of "releasing parties" that the activists and Allegheny County object to provides:[45]

" 'Releasing parties' means each settling state and any of its past, present and future agents, officials acting in their official capacities, legal representatives, agencies, departments, commissions and divisions; and also means, to the full extent of the power of the signatories to release past, present, and future claims, the following: (1) any settling state's subdivisions (political and otherwise, including, but not limited to, municipalities, counties, parishes, villages, unincorporated districts and hospital districts), public entities, public instrumentalities and public educational institutions; and (2) persons or entities acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer or any other capacity, whether or not any of them participate in this settlement, (A) to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public in such settling state or the people of the state, as opposed solely to private or individual relief for separate and

---

45. See *e.g.,* petition to intervene by Sklaroff at ¶11; petition by Allegheny County at ¶1.

distinct injuries, or (B) to the extent that any such entity (as opposed to an individual) is seeking recovery of health care expenses (other than premium or capitation payments for the benefit of present or retired state employees) paid or reimbursed, directly or indirectly, by a settling state." MSA §II(pp).

Even a cursory analysis of this definition suggests its complexity, with distinct qualifiers and limitations. Allegheny County argues that because the definition of "releasing parties" includes "counties," its interests have been compromised by the attorney general without its consent.[46] The anti-tobacco activists likewise claim this definition could include them as individuals and organizations "if they attempt to bring public interest litigation against the tobacco companies" even though they were "completely excluded from" the settlement negotiations and will receive no benefit from it whatsoever.[47]

More specifically, Allegheny County argues that the definition of "releasing parties" harms the county and creates a legally enforceable interest sufficient to intervene because "the harm is sustained at the point we go to court and the MSA is presented as a defense. It's the harm that we have to overcome this defense, and without this language, we would just go to court and prove our case." N.T. (1/12/99) at 14-15.

The Commonwealth counters that the scope of the release is clearly limited to "the power of the signatories [the attorney general of Pennsylvania] hereto to release past, present, and future claims."[48] At the hearing, the

---

46. Petition by Allegheny County, ¶1a and memorandum at 2.

47. Petition to intervene of Sklaroff at ¶11.

48. Commonwealth's response to the petition of Allegheny County at ¶1.

Commonwealth's counsel also emphasized that the MSA was, in essence, an agreement forged on a national scale involving 46 states and a number of territories. Counties and cities in some of these states had either filed their own claims or joined in the particular state's claims:[49]

"So the people who were trying to draft this agreement had to deal with political subdivisions. And, therefore, what they came up with is the language that, yes, there is a release for political subdivisions, but it is *'to the full extent of the power of the signatories hereto to release past, present and future claims.'*

*"They did not intend, by one sentence, to have the sweeping enforceable release on 46 states. They left it to a state-by-state determination of whether the attorney general does, indeed, have that power.*

"We have looked at the current law of Pennsylvania, your honor, and I stress the word current because as your honor is well aware, in some states, the plaintiffs got somewhat of a boost in the merits of their claims by significant substantive amendments to support their claims against the tobacco industry, and I have no idea what the future Commonwealth statutes could be, which might affect this. But based upon our review of the current Pennsylvania law, *we are not aware of any authority under the current law that gives the attorney general the authority to release the claims of political subdivisions or—by that, I'm including municipalities or counties.* That is one lawyer's opinion and it's not an opinion that's based on a really thorough saturation of work. It's just a preliminary review." [50]

---

49. N.T. (1/12/99) at 41-42.
50. N.T. (1/12/99) at 42-43. (emphasis added)

Moreover, at the conclusion of the hearing, the attorney general stated: "So with that, I thank the court for giving me the opportunity to say those remarks and I would say to the intervenors, I appreciate the good faith in which they all come here before this court. *We believe we have done nothing to interfere with their interest in settlement of our case,* and to the extent that we can continue to work with them, we are interested in their input and their public comments." [51]

These assurances as to the scope of the release, while potentially helpful, in a future case the county may seek to file against the tobacco defendants, underscore the hypothetical, abstract nature of the interest the county is asserting.

Like Allegheny County, the activists are concerned about any limitations that *might* affect any future—but as yet unfiled—claims against the tobacco defendants. As they argued in their petition to intervene, "[i]f the MSA is approved, its effect on petitioners and the class they represent will be to render them *vulnerable* to dismissal in *any future* action they *might* bring against the tobacco defendants in furtherance of their common goals in tobacco control. . . ." [52] The activists argue that "the release provisions of the MSA effect an unconstitutional deprivation of petitioners' right of access to the courts . . ." [53] but they cite to no concrete harm

51. N.T. (1/12/99) at 87-88. (emphasis added) Counsel for the Commonwealth likewise stated: "We do not believe that our settlement agreement, in any way, compromises their ability to pursue their claims, any of those groups, and we certainly do believe it's in the best interest of the Commonwealth." N.T. (1/12/99) at 47.

52. Petition to intervene of Sklaroff at ¶11(b).

53. Memorandum in support of activists' petition to intervene at 5.

other than the potential (but as yet undetermined) effect of the release. The Commonwealth counters, however, that the definition of "releasing parties" is inherently limited. First, the definition applies to persons or entities acting in certain specified capacities who seek relief "generally applicable to the general public" as opposed to private or individual relief.[54] Second, the definition applies to entities "seeking recovery of health care expenses (other than premium or capitation payments for the benefit of present or retired state employees) paid or reimbursed directly or indirectly, by a settling state." [55] Finally, the scope of the release for "releasing parties is specifically limited to the full extent of the power of the signatories hereto [*i.e.,* the attorney general]." [56]

These provisions, the Commonwealth argues, clearly would not apply to class actions involving Pennsylvania's smokers since that would not be a lawsuit applicable to the general public. They would also not apply to Pennsylvanians who sustained damage due to direct or indirect exposure to tobacco products.[57] "Therefore," the Commonwealth suggests, "it is hardly surprising that the petitioners failed to articulate any even theoretical future lawsuit that they could bring that would be released under this provision and that would not have been within the attorney general's power to release." [58]

---

54. Commonwealth's memorandum in response to the petition to intervene of Sklaroff at 11 (quoting MSA II(pp)).

55. *Id.* at ¶11.

56. *Id.*

57. Commonwealth's answer to the petition to intervene of Sklaroff at ¶6.

58. Commonwealth's memorandum in response to the petition to intervene of Sklaroff at 12.

During the hearing, the activists argued that "it is not a good idea to cut out all public interest litigation for the next 25 years" [59] and in so doing addressed the Commonwealth's arguments that their claims were hypothetical. "In response to the claim that our position is hypothetical," [60] the activists asked the court to consider their appendices, and especially the affidavit of Jeffrey Barg concerning the efforts of the organization, TEACH (Tobacco Free Education and Action Coalition for Health), to control the sale of tobacco to minors by Rite Aid in violation of a city ordinance. N.T. (1/8/99) at 43-44. This affidavit, however, does not describe any specific legal action undertaken by TEACH which might be threatened by the MSA. [61] Indeed, during the

---

59. N.T. (1/8/99) at 42.

60. N.T. (1/8/99) at 43.

61. See affidavit of Jeffrey Barg (1/9/99), exhibit B1 to activists' memorandum. In this affidavit, Mr. Barg describes the campaign against Rite Aid as follows:

"Most major tobacco retailers in the city took steps to comply with the law, but the Rite Aid Pharmacy chain openly flouted the tobacco placement provisions of the law. TEACH encouraged and aided the city in obtaining Rite Aid's compliance with the law. Without the *threat* of legal action, it is doubtful this could have been accomplished. The multistate settlement agreement bars future legal action not only against cigarette manufacturers, but also against distributors, retailers, employees and others. If this agreement had been in force last year, the city's and TEACH's hands would have been tied in its struggle with Rite Aid." Barg affidavit, ¶14. (emphasis added)

Significantly, Mr. Barg does not indicate that any specific legal action was taken against Rite Aid. Instead, he emphasizes the beneficial effect of a "threat" of a lawsuit. He also assumes and anticipates that the MSA would bar a future (but as yet unfiled) lawsuit, despite the inherent limitations within the MSA release and the absence of any court ruling whatsoever as to its scope in an actual case or controversy.

hearing, the activists emphasized how TEACH brought "Rite Aid to its knees essentially *through public opinion and through the threat of some sort of adverse action by the city.*" N.T. (1/8/99) at 44. (emphasis added) This example thus does not illustrate how the MSA affects or limits access to the courts for public interest lawsuits during the next 25 years.[62] It thus serves to underscore that the activists' constitutional challenge is anticipatory. An analysis of the effect on the MSA release on a particular public interest lawsuit must await the actual filing of such a suit.

This point was emphasized by the Pennsylvania Supreme Court when it concluded that the right to intervene based on a "legally enforceable interest" cannot be maintained where "the alleged harm is at best conjectural." *Pennsylvania Crime Commission Subpoena,* 453 Pa. 513, 522, 309 A.2d 401, 407 (1973). In *Pennsylvania Crime Commission,* individual policemen (retired and active duty) together with the Fraternal Order of Police ("appellants" or "intervenors") sought to prevent the police commissioner from complying with a subpoena issued by the Pennsylvania Crime Commission in its investigation of charges of widespread corruption in the Philadelphia Police Department. The court analyzed the right of these appellants to intervene in the subpoena enforcement proceeding under Pa.R.C.P. 2327(4). *Id.,* 453 Pa. at 519, 309 A.2d at 405.

---

62. To the extent that the activists might be suggesting that the MSA would deprive them of the city's supportive legal action, the City of Philadelphia, to the contrary, argues forcefully that the MSA does not impair its rights to assert any claims against the "released parties" because, inter alia, the attorney general lacks the authority "to release claims on behalf of the city." Hence, its decision to file an amicus brief rather than a petition to intervene. See brief of City of Philadelphia as amicus curiae at 4.

The intervenors asserted a legally enforceable interest in these proceedings on various grounds—including an invocation of their constitutional rights. They argued that the records sought under the subpoena might endanger their well-being since disclosure of their names, addresses, pictures and badge numbers could make them vulnerable to attack by those whom they had arrested. These records might also contain information about past infractions for which they had already been disciplined, but which would unnecessarily embarrass them in their present jobs. Release of these documents, they also asserted, would violate a number of their constitutional rights and only through intervention would they be able to assert these rights. *Id.,* 453 Pa. at 519, 309 A.2d at 405.

In analyzing these facts within the parameters of Pa.R.C.P. 2327(4), the Pennsylvania Supreme Court concluded that "[h]ere, we are not convinced that the interest asserted by appellants justified the lower court's granting intervention." *Id.,* 453 Pa. at 521, 309 A.2d at 406. First, the court concluded that an individual's "general interest in avoiding investigation does not, standing alone, afford him standing to object to the enforcement of a subpoena issued to a third party. Such a general interest is not of sufficient magnitude to allow intervention." *Id.,* 453 Pa. at 521, 309 A.2d at 406.

In reaching this conclusion, the court consciously struck a balance "between the protection of the rights of the individual and the avoiding of unnecessary restraint upon the state in the performance of its legitimate governmental purposes." *Id.,* 453 Pa. at 522, 309 A.2d at 407. In striking this balance, the Pennsylvania Supreme Court observed:

"In the present record it is clear that *the alleged harm is at best conjectural.* Admittedly, it will not flow

as a direct consequence of the proceedings before us, but rather if it does in fact occur it would be in connection with other proceedings that *may at some future time be instituted as a result of the information obtained. It must also be remembered that if these subsequent proceedings become an actuality the appellant then would be provided ample opportunity to present any objections to the use of such information." Id.,* 453 Pa. at 522-23, 309 A.2d at 407. (emphasis added) (footnote omitted)

The parallels between the intervenors in the *Pennsylvania Crime Commission* case and the instant petitioners are striking. Like the *Crime Commission* intervenors, the activists and Allegheny County raise anticipatory concerns about the effect of a third party's action (*i.e.,* their negotiated settlement) on a future action that they might bring. In analyzing the present record, this court must also strike a balance between the state's legitimate governmental purpose in settling its lawsuit with the need to protect the rights of the petitioners from unjust consequences of this settlement. Since at this point the interests of the activists and Allegheny County in some future action "are at best conjectural," the effect of the MSA release provisions—if any— cannot be determined except in the context of that future proceeding. At that point, they would have ample opportunity to demonstrate why the release provisions do not apply. On the present record, the petitioners fail to present an actual case or controversy—a legally enforceable interest—ripe for disposition.

Thus, the county's concern that the release provisions "will render them vulnerable to dismissal of any *future* action they *might* bring against the tobacco defendants in pursuing a cause of action that already exists or

*might* exist in the *future*" [63] fails to prevent an actual case or controversy ripe for disposition. *Treski v. Kemper National Insurance Companies,* 449 Pa. Super. 620, 634, 674 A.2d 1106, 1113 (1996) (because ripeness is a prerequisite for judicial review, the trial court did not err in dismissing an action where plaintiffs failed to suffer an actual injury due to the insurers' misrepresentations as to the effect of the New Jersey "Deemer Statute"). See also, *Neshaminy Water Resources Authority v. Commonwealth, Department of Environmental Resources,* 511 Pa. 334, 341, 513 A.2d 979, 982 (1986) (action attacking DER regulations governing the method for determining acceptable phosphorous levels in water under the plaintiffs' jurisdiction was properly dismissed for failing to present a ripe case or controversy where plaintiff failed to show immediate and adverse impact on the waters); *Roeder v. Hatfield Borough Council,* 439 Pa. 241, 248, 266 A.2d 691, 695-96 (1970) (the court properly quashed an appeal which sought to have a zoning amendment declared invalid where "absolutely nothing had happened under the ordinance to create a case or controversy ripe for judicial intervention"); *Borough of Marcus Hook v. Pennsylvania Municipal Retirement Board,* 720 A.2d 803 (Pa. Commw. 1998) (where issue on appeal relates to hypothetical facts, the petition for review is dismissed for seeking an impermissible advisory opinion).

As previously discussed in the context of the hospitals' petition, since this court has not concluded that the petitioners' claim is not ripe, any discussion of their substantive constitutional rights would be an advisory opinion without legal effect. See *e.g., Gulnac v. South Butler County School District,* 526 Pa. 483, 487, 587

---

63. Allegheny County's petition at ¶1a.

A.2d 699, 701 (1991) (trial court unnecessarily decided a constitutional issue in a vacuum, rendering "an advisory opinion which our courts are not entitled to do"). But cf. *Reichley by Wall v. North Penn School District,* 533 Pa. 519, 626 A.2d 123 (1993) (distinguishing the facts of *Gulnac*). See generally *Gabel v. Cambruzzi,* 532 Pa. 584, 592, 616 A.2d 1364, 1369 (1992) (where court lacks sufficient facts to issue anything but an advisory opinion it "will not break its tradition of refusing to author advisory opinions"); *In re Application of Milton S. Hershey Medical Center, supra,* 407 Pa. Super. at 571, 595 A.2d at 1293, quoting *Okkerse v. Howe,* 521 Pa. 509, 520, 556 A.2d 827, 833 (1989) (an advisory opinion is without legal effect).

The activists and Allegheny County, in addition, argue that their interests are potentially affected by the MSA's indemnification provisions set forth in section XII, relating to "settling states' release, discharge and covenant." They assert that even if future litigation determines that they are not precluded from bringing a suit against tobacco defendants because they are not "releasing parties" under the MSA, their legally enforceable interests will be harmed by section XII(b), the "litigating releasing parties offset," [64] which provides in relevant part:

"If a releasing party (or any person or entity enumerated in subsection II(pp) without regard to the power of the attorney general to release claims of such person or entity) nonetheless attempts to maintain a released claim against a released party, such released party shall give written notice of such potential claim to the attorney general of the applicable settling state within 30 days

---

64. See *e.g.,* petition to intervene of Sklaroff at ¶12 and petition to intervene of Allegheny County at ¶2.

of receiving notice of such potential claim. . . . The released party may offer the release and covenant as a complete defense. *If it is determined at any point in such action that the release of such claim is unenforceable or invalid for any reason (including, but not limited to, lack of authority to release such claim), the following provisions shall apply:*

"(1) the released party shall take all ordinary and reasonable measures to defend the action fully. The released party may settle or enter into a stipulated judgment with respect to the action at any time in its sole discretion, but in such event, the offset described in subsection (b)(2) or (b)(3) below shall apply· only if the released party obtains the relevant attorney general's consent to such settlement or stipulated judgment, which consent shall not be unreasonably withheld. . . .

"(2) . . . .

"A. *In the event of a settlement or stipulated judgment, the settlement or stipulated amount shall give rise to a continuing offset as such amount is actually paid against the full amount of such original participating manufacturers' share . . . of the applicable settling state's allocated payment until such time as the settled or stipulated amount is fully credited on a dollar-for-dollar basis.*" [65]

This offset provision, both the activists and Allegheny County argue, will harm them because it "will cause the Commonwealth of Pennsylvania to intervene in any such litigation against a tobacco defendant, to strengthen the tobacco defendants' defense" because any recovery awarded to the activists would be offset by the Com-

---

65. MSA §XII(b) as quoted by petition to intervene by Sklaroff at ¶12 and petition to intervene by Allegheny County at 2. (emphasis added in petitions)

monwealth to its financial detriment.[66] During the intervention hearing, counsel for the activists elaborated on how this provision affected the activists' legally enforceable interests:

"Our legally enforceable interest, your honor, is two-fold. It is our interest in access to the courts not just in a particular piece of litigation, but over the next 25 years in our access to the courts. And, secondly, our interest in being able to engage the tobacco industry as opposed to the state as a defendant in litigation. Those are our two legally enforceable interests that are being squelched essentially by this agreement and are going to basically make it very difficult for us to scare anybody after this." [67]

To remedy this ill, the activists asked the court to condition its approval of the MSA on the deletion of "all individuals and entities who are not political subdivisions of the Commonwealth" from the definition of "releasing parties." [68]

The Commonwealth objected to these contentions on various grounds. It argued, for instance, that the activists' concerns were based on hypothetical cases which might be brought in the future. Thus, they were not ripe. It also asserted that the MSA did not require the attorney general to intervene on behalf of the tobacco industry, "nor would he have any reason to do so." [69] Moreover, the release provisions would not affect plaintiffs who successfully sued the tobacco defendants for recovery; rather they would collect their full amount

66. Petition to intervene of Sklaroff at ¶12(b). Allegheny County petition at ¶2.

67. N.T. (1/8/99) at 51.

68. Petition to intervene of Sklaroff at ¶13.

69. Commonwealth's answer to the motion to intervene of Sklaroff at ¶¶12 & 6.

from the defendants.[70] The Commonwealth also suggests the dangers inherent in tampering with the definition of "releasing parties," because it is an essential, nonseverable term within section XII of the MSA. Consequently, if it was modified prior to approval of the MSA, a team of attorneys general would have to be appointed to renegotiate the terms. The tobacco manufacturers would be under no obligation to accept these terms, and the MSA could be terminated as to Pennsylvania.[71]

The arguments of the Commonwealth were ultimately convincing. The interests asserted by the activists in being able to inflict financial harm on the tobacco manufacturers were speculative and remote. The exact implementation of the offset provisions is, at this point, conjectural. At the point where the activists actually trigger the offset provisions, their arguments could be analyzed within a concrete factual scenario. Moreover, the exact basis for—and nature of—their protest against these indemnification and offset provisions is unclear, partly because they cite no supporting authority of any kind. Thus, the activists assert:

"Against this background, petitioners' position in this litigation is that the release provisions of the MSA effect an unconstitutional deprivation of petitioners' right of access to the courts and that the indemnity provisions of the MSA, by which the citizenry indemnifies the tobacco companies even for awards of punitive damages, are directly contrary to the public policy of the state which expressly forbids insurance against such

---

70. Commonwealth's answer to petition to intervene by Sklaroff at ¶12.

71. Commonwealth's memorandum in opposition to the petition to intervene of Sklaroff at ¶7 n.5 (citing MSA §XVIII(o)).

liabilities." Memorandum in support of activists' petition to intervene at 5.

It is thus not entirely clear whether the activists object to the offset provisions as a denial of their constitutional right of access of the courts or if they assert it is objectionable as "bad policy" which the court must help correct.

If they are raising constitutional objections, these would not be ripe until they can demonstrate an actual harm—at the very least, that the offset provisions were triggered. In attacking the indemnity provisions, however, the activists appear to focus primarily on policy—as opposed to constitutional—concerns:

"The effect of this indemnity is to reverse the interests inter sese of the states and the petitioners. Without the indemnity, the states' interest and the petitioners' interest in the outcome of public interests claims against tobacco companies were the same; both wanted to maximize recovery; the petitioners could be viewed as supporters of the state. The indemnity reverses the lineup; the petitioners still want to maximize recovery, but now the state wants to minimize it. *This converts the petitioners from supporters to opponents of the state, clearly, bad public policy that should have been (but was not) debated."* [72]

The activists' request that this court modify a hard-fought settlement agreement based on its "policy" decisions—or theirs—is problematic for several reasons. First, the activists have not established the requisite standing. Second, their policy arguments do not constitute "legally enforceable interests" since they do not provide justiciable standards for a court's review.

---

72. Activists' memorandum at 4 n.4. (emphasis added)

The basic requirements for standing were recently outlined by the Pennsylvania Supreme Court in *Sierra Club v. Hartman,* 529 Pa. 454, 456, 605 A.2d 309, 310 (1992):

"Generally, in order to have standing, a party must have an interest in the controversy that is distinguishable from the interest shared by other citizens. To surpass that common interest, the interest must be substantial, direct and immediate."

In outlining this test, the *Sierra Club* court emphasized that "[r]ooted in this precept (of standing) is the notion that for a party to maintain a challenge to an official order or action his rights must have been invaded or infringed." *Id.* There is also a general exception to this general rule "when the degree of causal connection is small but judicial review is necessary to protect against governmental action which otherwise would go unchallenged." *Id.,* 529 Pa. at 457, 605 A.2d at 310-11.

In applying these principles, the Pennsylvania Supreme Court concluded that the Sierra Club lacked standing to bring an action seeking mandamus and equitable relief for the legislature's veto barring publication of a proposed air pollution regulation. The plaintiffs' alleged deprivation of a constitutional right to clean air and proper functioning of the state government did not establish the group's standing to bring its action because these claims were "general in nature and arguably common to all Commonwealth citizens." *Id.,* 529 Pa. at 457, 605 A.2d at 311. Similarly, the tobacco activists lack standing, since in asserting that the indemnification provisions in the MSA infringe on their rights, they fail to establish either direct or immediate harm. See also, *In re Biester,* 487 Pa. 438, 444, 409 A.2d 848, 851 (1979) (standing requires an interest that is substantial, direct, and immediate); *Pennsylvania*

*Crime Commission Subpoena, supra,* 453 Pa. at 521, 309 A.2d at 406 (an individual's general interest does not give him standing and "is not of sufficient magnitude to allow intervention"). Moreover, the effects of the indemnification on the petitioners could be subject to review once the offset provisions have actually been triggered.

The activists' assertion that the settlement agreement represents bad policy because it forces the state to indemnify the tobacco industry and "converts the petitioners from supporters to opponents of the state" [73] similarly does not provide a "legally enforceable interest" for the activists' intervention nor does it provide a basis for this court's interference with the settlement process. The activists, in essence, are asking this court to make a political, policy decision—or to adopt theirs— in substitution of the attorney general's judgment in entering into a settlement agreement.

This raises issues analogous to the political question doctrine. In analyzing whether a case raises a nonjusticiable political question, the Pennsylvania Supreme Court has emphasized that the political question doctrine derives from the separation of powers inherent in the federal constitution. See *e.g., Blackwell v. City of Philadelphia,* 546 Pa. 358, 684 A.2d 1068 (1996). The *Blackwell* court further emphasized that "courts will not review actions of another branch of government where political questions are involved because the determination of whether the action taken is within the power granted by the constitution has been entrusted exclusively and finally to political branches of the government for self-monitoring." *Id.,* 546 Pa. at 364, 684 A.2d at

---

73. Activists' memorandum at 4 n.4. See also, N.T. (1/8/99) at 53 and 66.

1071. In analyzing whether a particular case presents such a nonjusticiable political question, the Pennsylvania Supreme Court has repeatedly emphasized the criteria set forth by the United States Supreme Court in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962):

"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment to a coordinate political department; *or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;* or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncement by various departments on one question." *Zemprelli v. Daniels,* 496 Pa. 247, 256, 436 A.2d 1165, 1169 (1981), quoting *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 685-86 (1962).[74]

"The presence of any *one* of these elements," the Pennsylvania Supreme Court recently observed, "will prompt a court to refrain from considering the claim asserted." [75] To the extent that the activists base their

---

74. The Pennsylvania Supreme Court has relied on the *Baker v. Carr* analysis in other cases where it considered whether a particular case presented a nonjusticiable political question. See *e.g., Blackwell v. City of Philadelphia,* 546 Pa. 358, 364, 684 A.2d 1068, 1071 (1996); *Thornburgh v. Lewis,* 504 Pa. 206, 211, 470 A.2d 952, 955 (1983); *Sweeney v. Tucker,* 473 Pa. 493, 510, 375 A.2d 698, 706 (1977).

75. *Blackwell, supra,* 546 Pa. at 364, 684 A.2d at 1071. (emphasis added)

arguments against the indemnification provisions of the MSA on policy considerations concerning its potential effects, they failed to provide this court with "judicially manageable standards." They were seeking "an initial policy determination of a kind clearly for nonjudicial discretion." A different case would have been presented if they had invoked a statute or constitutional basis for review of an actual harm suffered.[76] As the Penn-

---

76. The Pennsylvania Supreme Court, as the arbiter for determining the presence of a nonjusticiable political question, has emphasized the essentially narrow scope of this exception to judicial review in Pennsylvania: "We believe that proper consideration of the state judiciary's function in our federalist system of government militates toward a construction of the Pennsylvania Constitution which will *minimize* the number of federal constitutional issues insulated from state court review by the application of the political question doctrine in Pennsylvania." *Sweeney v. Tucker,* 473 Pa. 493, 519, 375 A.2d 698, 710 (1977). (emphasis added) Thus, while the Pennsylvania Supreme Court on various occasions has considered whether a particular issue is a nonjusticiable political question, it frequently concluded that it could exercise review based on a constitutional or statutory provision. See *e.g., Sweeney, supra,* 473 Pa. at 522-23, 375 A.2d at 712 (the expulsion of a state House member was subject to judicial review where a due process claim was raised); *Thornburgh v. Lewis, supra,* 504 Pa. at 214-16, 470 A.2d at 956-57 (the issue of whether the executive branch of the Commonwealth may be required to supply budgetary information at the request of the minority chairman of the Senate Appropriations Committee was subject to judicial review based on constitutional and statutory provisions); *Zemprelli v. Daniels, supra,* 496 Pa. at 253-58, 436 A.2d at 1168-70 (the validity of an executive appointment by the governor as voted on by the Senate was subject to judicial review based on the constitution). But see *Blackwell v. City of Philadelphia, supra,* 546 Pa. at 360, 684 A.2d at 1069 (the firing of a Philadelphia city councilwoman's special assistant was a nonjusticiable political question because it implicated the internal rules of the Philadelphia City Council).

sylvania Supreme Court recently observed, "[p]olicy considerations" are "for the legislature and not the courts to determine and act on." *Reichley by Wall v. North Penn School District,* 533 Pa. 519, 529, 626 A.2d 123, 129 (1993).

Under the Pennsylvania Constitution, the attorney general, an elected member of the executive department of the state government, is the "chief law officer of the Commonwealth" empowered "to exercise such powers and perform such duties as may be imposed by law." Pennsylvania Constitution Article IV Section 4.1 and Article IV Section 1. The legislature, by statute, provides that he shall "collect, by suit or otherwise, all debts" that are "due the Commonwealth." 71 P.S. §732-204(c). The exact scope of this authority, as previously discussed, remains to be explored when concrete cases and controversies are posed. Policy arguments alone, however, fail to provide an adequate standard for review at this point. If the attorney general has engaged in a bad policy decision, as the anti-tobacco activists contend, the remedy lies in challenging the attorney general electorally or in filing lawsuits when and if a successful claim has resulted in a setoff.

In concluding that neither the activists nor Allegheny County have established the requisite legally enforceable interest to intervene in this case, it is important to emphasize that this court is not concerned with any technical defects in the activists' or county's petition (such as its failure to attach a pleading as required by Pa.R.C.P 2328).[77] On the contrary, the critical factor

---

77. Moreover, during the hearing, the Commonwealth specifically waived its objections to any technical defects in the county's petition. See N.T. (1/12/99) at 60-61. A petition to intervene should not be dismissed for purely technical defects since petitioners should be

is that the "legally enforceable interest" raised by the activists and county is based on events yet to occur. Interpretation of the scope of the release, in contrast, must evolve through actual case-by-case analysis as Judge Sosmon of Massachusetts eloquently observed in explaining her approval of the MSA:

"All the other attorney generals, and all the other public entities that have brought these kinds of cases in other jurisdictions, have accepted this settlement. That itself speaks volumes for the fact that many have perceived—all have perceived that this settlement is indeed worth giving up their claims just as the attorney general has decided.

"There is, and I do have some questions about the specific issue of the scope of the release that this attorney general purports to grant in this agreement.

"As I read the master settlement agreement, it seems to itself acknowledge that there is uncertainty as to the precise contours of that release because there is uncertainty as to the precise contours of the attorney general's authority, and *presumably, those contours are different in differing states depending upon what authority those state's law grant their attorney general.*

"*As I read the document, that is an issue that would have to be addressed if and when such a suit were to arise. There would first be a series of definitional issues about any particular suit that was brought: was it a suit brought by a releasing party as that term is defined in the agreement; is it against a released party, as that term is defined; is it based on a released claim, as that term is defined? And if all of those ques-*

---

granted leave to amend. See *e.g., Esso Standard Oil Co. v. Taylor,* 399 Pa. 324, 331, 159 A.2d 692, 695 (1960); *Hayes v. School District of Pittsburgh,* 33 Pa. Commw. 71, 75, 381 A.2d 193, 195 (1977).

*tions were answered that, yes, one would then have to address the issue, if so, is that beyond this particular attorney general's authority.*

*"The master settlement agreement does not purport to make that precise decision, or even to give it terribly precise definitions at this stage. It would need to be addressed on a case-by-case basis. And I see no reason to hold off this settlement because of that particular problem."* [78]

## VI. PREJUDICE TO THE SETTLING PARTIES

The Pennsylvania Rules of Civil Procedure also provide that a petition to intervene may be refused if "the intervention will unduly *delay,* embarrass or *prejudice* the trial or *adjudication of the rights of the parties."* Pa.R.C.P. 2329(3). (emphasis added) Allowing the petitioners to intervene in the final settlement stages of this action would both unduly delay and prejudice the resolution of the Commonwealth's lawsuit.

The MSA contains a complicated scheme for achieving "final approval." It provides, for instance, that " 'final approval' means the earlier of: (1) the date by which state-specific finality in a sufficient number of settling states has occurred; or (2) June 30, 2000." MSA §II(u). A key event in achieving "final approval," therefore, is the attainment of "state-specific finality" in a requisite number of states:

---

78. See *Commonwealth of Massachusetts v. Philip Morris,* no. 95-7378 (Mass. Sup. Ct.); transcript (12/3/98) (Sosman, J.) at 21-22 (emphasis added), attached as exhibit A to Philip Morris's answer to the petition to intervene of American Council on Science and Health.

"For the purposes of this subsection(u), 'state-specific finality in a sufficient number of settling states' means that state-specific finality has occurred in both:

"(A) a number of settling states equal to at least 80 percent of the total number of settling states; and

"(B) settling states having aggregate allocable shares equal to at least 80 percent of the total aggregate allocable shares assigned to all settling states." MSA §II(u).

For a specific state, the attainment of "state-specific finality" is thus crucial. According to the MSA, a state attains this degree of finality when the following occurs:

"(1) this agreement [*i.e.,* the MSA] and the consent decree have been approved and entered by the court as to all original participating manufacturers, or, in the event of an appeal from or review of a decision of the court to withhold its approval and entry of this agreement and the consent decree, by the court hearing such appeal or conducting such review;

"(2) entry by the court has been made of an order dismissing with prejudice all claims against released parties in the action as provided herein; and

"(3) the time for appeal or to seek review of or permission to appeal from the approval and entry as described in subsection (1) hereof and entry of such order described in subsection (2) hereof has expired; or, in the event of an appeal from such approval and entry, the appeal has been dismissed, or the approval and entry described in (1) hereof and the order described in subsection (2) hereof have been affirmed in all material respects by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no longer subject to further appeal (in-

cluding, without limitation, review by the United States Supreme Court)." MSA §II(ss).

During the intervention hearing, Attorney General Fisher emphasized how critical it was that Pennsylvania reach "state specific finality" as soon as possible so that it could benefit from the settlement recovery. He urged that "it's very important for the people of Pennsylvania to be able to move forward." N.T. (1/12/99) at 85. More specifically, "it's so important for this court to allow that time period to begin so that the lawmakers and the governor can make the best decisions possible, as quickly as possible, as to how to utilize the provisions of this agreement for the public health of Pennsylvania." *Id.* at 86. Failure to attain state-specific finality, he warned, "could mean that Pennsylvania would fall behind in receipt of the monies, which hopefully the general assembly and the governor will use for public health purposes." *Id.*

Allowing intervention during this final stage of the Commonwealth's lawsuit would inevitably have caused delay. The petition to intervene by the activists, for instance, posed a particular threat of delay since they sought to intervene not only as individuals but also as a class. The Pennsylvania Rules of Civil Procedure impose very precise requirements for the certification of a class that could seriously delay the attainment of "state-specific finality" in Pennsylvania. The rules require that a class action complaint be filed and that the case be assigned to a particular judge. Pa.R.C.P. 1703. The responding parties may then file preliminary objections, Pa.R.C.P. 1705 or an answer, Pa.R.C.P. 1706. After the pleadings, the court must then decide whether the class should be certified. Pa.R.C.P. 1707-1710. See also, *Janick v. The Prudential Insurance Co.,* 305 Pa. Super. 120, 129, 451 A.2d 451, 455 (1982) ("A court

may not make the initial class action determination until after the close of pleadings, to ensure that the class proponent is presenting a non-frivolous claim capable of surviving preliminary objections."). Significantly, if a court denies class certification, that order can be appealed with all the inherent delays of that process. *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 398, 676 A.2d 1237, 1239 (1996), *appeal denied,* 546 Pa. 655, 684 A.2d 557 (1996).

Allowing intervention at this point in the settlement process would not only unduly delay the resolution of the settling parties' lawsuit. Such delay itself might also jeopardize the agreement, thereby severely prejudicing all the settling parties. This prejudice is an especially serious concern in light of the petitioners' failure to establish the requisite "legally enforceable interests" for intervention. For these reasons as well, therefore, the petitions to intervene were denied.

## VII. APPROVAL OF THE CONSENT DECREES

The Commonwealth and tobacco defendants asked this court to approve their settlement and to enter a consent decree. This consent decree creates continuing jurisdiction with this court for consideration of any interpretation or enforcement issues that may arise under the agreement as they relate to Pennsylvania. It would not, however, require the court "to actively monitor compliance with the settlement." [79]

There are several reasons why the parties seek court approval. First, the master settlement agreement requires uniform approval procedures throughout the various settling states. Moreover, the parties emphasize that public law settlements spanning many years are fre-

---

79. Commonwealth's settlement memorandum at 6-7.

quently complicated documents that benefit from continuing oversight by a court familiar with the issues. Moreover, "a court that maintains continuing jurisdiction over a consent decree will have a more flexible repertoire of enforcement measures." [80]

A consent decree is arrived at through negotiation and settlement. *In re. John W.,* 300 Pa. Super. 293, 297, 446 A.2d 621, 623 (1982). By its very nature, therefore, a consent decree "requires the understanding of or ratification by the respective parties." *Archbishop v. Karlak,* 450 Pa. 535, 541, 299 A.2d 294, 297 (1973). (footnote omitted) As the Pennsylvania Supreme Court has observed, a consent decree "is not a legal determination of the matters in controversy; it has the binding force of a legal determination on the parties thereto only." *Sabatine v. Commonwealth,* 497 Pa. 453, 457-58, 442 A.2d 210, 212 (1981).[81]

In essence, a consent decree is a contract that binds the parties to its terms and a court may not modify it absent fraud, accident or mistake. *Universal Builders Supply Inc. v. Shaler Highlands Corp.,* 405 Pa. 259, 265, 175 A.2d 58, 61 (1961). See also, *Jones Memorial Baptist Church v. Brackeen,* 416 Pa. 599, 602-603, 207 A.2d 861, 863 (1965); *Dravosburg Housing Association*

---

80. Commonwealth's settlement memorandum at 6-8 (quoting *Local No. 93, International Association of Firefighters v. City of Cleveland,* 478 U.S. 501, 523-24 n.13 (1986). (citations omitted)

81. Justice Brennan also emphasized this limited scope of a consent decree when he observed: "Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party without that party's agreement." Consequently, "a court may not enter a consent decree that imposes obligations on a party that may not consent to the decree." *Local Number 93, International Association of Firefighters v. City of Cleveland,* 478 U.S. 501, 529 (1986).

*v. Borough of Dravosburg,* 71 Pa. Commw. 144, 149, 454 A.2d 1158, 1161 (1983). But even though a consent decree is not a "legal determination by the court of the matters in controversy, . . . it binds *the parties* with the same force and effect as if a final decree has been rendered after a full hearing upon the merits, . . . ." *Armstead v. Dandridge,* 257 Pa. Super. 415, 424, 390 A.2d 1305, 1310 (1978) (citations omitted); *Pennypack Woods Home Ownership Association v. Regan,* 298 Pa. Super. 170, 173, 444 A.2d 715, 716 (1982). Because of its nature as a binding contract, it is imperative that each party has fully consented to it. *Pennsylvania Human Relations Commission v. Graybill,* 482 Pa. 143, 148, 393 A.2d 420, 423 (1978); *Commonwealth of Pennsylvania v. Rozman,* 10 Pa. Commw. 133, 137, 309 A.2d 197, 199-200 (1973).

In light of these principles, this court approved the consent decrees that all the parties endorsed in their joint motion to approve the settlements and consent decree. This complicated settlement was reached after months of vigorous arms-length negotiations.[82] It spares all parties incalculable expense and the uncertainties inherent in such complex litigation. The claims asserted by the Commonwealth's 10-count complaint brought in its capacity as sovereign, and as parens patriae on behalf of all of its citizens, were often novel and subtle. Resolution of such fundamental questions as whether subrogation is the exclusive statutory remedy for recouping the state's Medicaid expenditures was far from clear-cut as evidenced by conflicting precedent from other states. Compare *Illinois v. Philip Morris,* no. 96L13146, slip op. at 7 (Illinois Cir. Ct., Cook Cty., Nov. 13, 1997) with *Iowa v. R.J. Reynolds,* no. CL71048, slip op. at 6-7 (Iowa Dist. Ct., Polk Cty., Aug. 26, 1997). While other state courts in approving the MSA

---

82. Commonwealth's settlement memorandum at 5.

have noted the risks the attorneys general faced with their cases,[83] the tobacco defendants faced the formidable task of defending in 46 states actions raising complex issues that had to be fought out in a maze of varying state statutes and precedent.

Not only does the settlement spare the parties the expense and risks of continuing litigation, it accords with the strong judicial policy in Pennsylvania favoring voluntary settlements. See *e.g., Muhammad v. Strassburger,* 526 Pa. 541, 548, 587 A.2d 1346, 1349 (1991), *cert. denied,* 502 U.S. 867 (1991) ("A long-standing principle of our courts has been to encourage settlements."). But cf. *McMahon v. Shea,* 547 Pa. 124, 688 A.2d 1179 (1997) (limiting *Muhammad* to its facts). See also, *Rothman v. Fillett,* 503 Pa. 259, 266, 469 A.2d 543, 546 (1983) ("There is a strong judicial policy in favor of parties voluntarily settling lawsuits."). For one thing, settlements assure more expeditious compensation for those who are injured, since they avoid the inevitable delays of the appellate process. In addition, settlements help reduce overcrowded courts, thereby shortening a litigant's wait for a trial date. They also reduce the burdens and expenses in maintaining court systems. *Muhammad, supra,* 526 Pa. at 548-49, 587 A.2d at 1350. See also, *Rothman v. Fillett, supra,* 503 Pa. at 267, 469 A.2d at 546. Not surprisingly, the Pennsylvania Supreme Court observed, the astute lawyer Abraham Lincoln advised: "Persuade your neighbors to compromise whenever you can. Point out to them

---

83. As Judge Anna Brown of Oregon noted: "The state had significant risk, and, I believe, recognized that, as did the other attorneys general on these novel theories. It's extremely important that there has been garnered a benefit out of extremely risky litigation in terms of a consummate analysis." *State of Oregon v. American Tobacco,* no. 9706-4457 (Cir. Ct. Oregon, Multnomah Cty), N.T. 11/30/98 at 49, presented as exhibit C to Commonwealth's response to petition to intervene of Sklaroff.

how the nominal winner is often a real loser—in fees, expenses and waste of time." [84]

## CONCLUSION

The attorneys general—in launching their landmark lawsuits against the tobacco industry—necessarily undertook the unpredictable financial risks borne by all litigants. The settlement agreements eliminate these risks—while affording undeniable benefits to the citizens of Pennsylvania. The MSA will thus provide billions of dollars to the Commonwealth to be dedicated to the public good. The voluntary restraints that the tobacco defendants have accepted on their powers of persuasion—especially as directed to the youth of Pennsylvania—may also afford inestimable benefits. For these reasons, this court entered the consent decree and approved the MSA and STMSA on January 13, 1999. To have done otherwise would have been a manifest abuse of discretion.

---

84. *Muhammad v. Strasburger, supra,* 526 Pa. at 551, 587 A.2d at 1351 (quoting Abraham Lincoln as quoted in Burger, "Isn't There a Better Way?", 68 ABAJ 274, 275 (1982)). (footnote omitted)